**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**UMC DEVELOPMENT, LLC,**

**JACKSOPHIE GSCH, LLC**,

                 Plaintiffs,

   v.

**DISTRICT OF COLUMBIA**,

**MURIEL BOWSER**, in her official capacity
as Mayor of the District of Columbia,

**NOT-FOR-PROFIT-HOSPITAL CORP.**,

              Defendants.

Case No. 1:13-cv-00899-GK

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF
MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT AND
<u>OPPOSITION TO THE DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Factual Background ..................................................................................................... 4

Procedural Background ................................................................................................ 11

Argument ..................................................................................................................... 13

I.     Leave To Amend The Complaint Should Be Granted ..................................... 14

II.    The Developers Have Article III Standing ...................................................... 16

      A.    The Developers' Complaint Demonstrates Multiple Injuries-in-Fact. ................ 16

            1.    The Developers Lost Their Existing Interests In The Land. ..................... 17

            2.    The Developers Lost Their Conditional Interest In Obtaining Title ......... 18

            3.    The Developers Were Injured By The Sham Foreclosure Sale. ............... 21

      B.    The Developers' Injuries Are Fairly Traceable To Defendants ........................... 23

      C.    The Developers' Injuries Are Redressable By This Court. ................................ 24

III.   The Miscellaneous Legal Doctrines Invoked By The Defendants Do Not Block The Developers' Claims ............................................................................................. 26

      A.    Sovereign Immunity Does Not Apply ................................................................ 26

      B.    The *Rooker-Feldman* Doctrine Does Not Apply ................................................ 27

      C.    Collateral Estoppel Does Not Apply ................................................................... 28

      D.    D.C. Code § 12-309 Does Not Apply .................................................................. 31

            1.    Counts III, VII, & IX Do Not Seek Unliquidated Damages. .................... 32

            2.    The District Had Adequate Notice Under § 12-309. ............................... 34

      E.    The Developers' Claims Are Timely .................................................................. 36

            1.    The Developers' Federal Claims Are Timely. ......................................... 36

            2.    The Developers' State Law Claims Are Timely. ..................................... 38

      F.    The Developers' Federal Claims Are Ripe. ........................................................ 40

IV.   The Developers State Claims for Which Relief Can Be Granted ..................... 41

A.      The Developers Have Alleged Wrongdoing By NFPH. ....................................... 41

B.      The Developers State A Due Process Claim......................................................... 42

        1.      The Developers State A Procedural Due Process Claim ...........................43

        2.      The Developers State a Claim for Substantive Due Process. ...................46

C.      The Developers State A Takings Claim............................................................... 49

        1.      The Developers Had A Recognizable Property Interest in the Land.........49

        2.      The Developers Allege A Complete Property Deprivation. .....................50

        3.      Alternatively, The Developers Allege A Compensable Deprivation Of
                Their Property Interests Under the *Penn Central* Factors. ......................51

D.      The Developers State A Cause Of Action For Wrongful Foreclosure. ............... 53

        1.      The Developers Adequately Allege Facts Supporting Their Wrongful
                Foreclosure Action....................................................................................53

        2.      The GSI Partnership Was Never Dissolved..............................................54

        3.      The Developers Have A Property Interest In The Land. ..........................55

E.      The Developers State Claims For Specific Performance & Constructive Trust... 56

        1.      The Developers May Plead Alternative Theories of Recovery. ...............56

        2.      The Developers Are Entitled To Seek Specific Performance and
                Constructive Trust Against the District. ...................................................57

        3.      The Developers Are Entitled To Specific Performance Because They
                Were Ready, Willing And Able To Perform The Operating Agreement. .58

F.      The Developers State A Claim For Tortious Interference With A Prospective
        Economic Relationship. ...................................................................................... 59

G.      The Developers State A Claim For Breach Of Contract As A Third-Party
        Beneficiary. ........................................................................................................ 61

V.      The Court Should Exercise Supplemental Jurisdiction .................................................. 63

Conclusion ...................................................................................................................................... 64

# TABLE OF AUTHORITIES

**Page**

## Cases

*ACORN v. County of Nassau,*
    2006 U.S. Dist. LEXIS 50217 (E.D.N.Y. July 21, 2006) ......................................................20

*Adams v. Watson,*
    10 F.3d 915 (1st Cir. 1993) ......................................................................................................18

*Alama Land & Cattle Co., v. Arizona,*
    424 U.S. 295 (1976) .................................................................................................................50

*Almota Farmers Elevator & Warehouse Co. v. United States,*
    409 U.S. 470 (1973) ..........................................................................................................43, 50

*Amen v. City of Dearborn,*
    718 F.2d 789 (6th Cir. 1983) ..............................................................................................51, 52

*Archer Gardens v. Brooklyn Center Dev. Corp.,*
    468 F. Supp. 609 (S.D.N.Y. 1979) ......................................................................................51, 52

*Arlington Heights v. Metropolitan Housing Development Corporation*
    429 U.S. 252 (1977) ..........................................................................................................20, 21

*Armendariz v. Penman,*
    75 F.3d 1311 (9th Cir. 1996) ..................................................................................................49

*Armenian Assembly of Am., Inc. v. Cafesjian,*
    772 F. Supp. 2d 129 (D.D.C. 2011) .......................................................................................24

*Armstrong v. United States,*
    364 U.S. 40 (1960) ...................................................................................................................49

*Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.,*
    885 F. Supp. 2d 156 (D.D.C. 2012) .......................................................................................50

*Atherton v. District of Columbia,*
    567 F.3d 672 (D.C. Cir. 2009) ...........................................................................................13, 52

*Barnhardt v. District of Columbia,*
    8 A.3d 1206 (D.C. 2010) .........................................................................................................35

*Batra v. Bd. of Regents of Univ. of Nebraska,*
    79 F.3d 717 (8th Cir. 1996) ....................................................................................................21

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................................13

*Bennis v. Michigan,*
    516 U.S. 442 (1996)....................................................................................52

*Biddison v. City of Chicago,*
    921 F.2d 724 (7th Cir. 1991) ......................................................................36

*Blocker-Burnette v. District of Columbia,*
    730 F. Supp. 2d 200 (D.D.C. 2010)............................................................33

*Boggs v. Merletti,*
    987 F. Supp. 1 (D.D.C. 1997)......................................................................24

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988)....................................................................................32

*Browning v. Clinton,*
    292 F.3d 235 (D.C. Cir. 2002) ..............................................................60, 61

*Brugh v. White,*
    103 So. 2d 800 (Ala. 1957) ........................................................................50

*Bryant v. Yellen,*
    447 U.S. 352 (1980)....................................................................................24

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014)................................................................................19

*Byrd v. District of Columbia,*
    538 F. Supp. 2d 170 (D.D.C. 2008)............................................................33

*CASCO Marina Development, L.L.C. v. D.C. Redevelopment Land Agency,*
    834 A.2d 77 (D.C. 2003).......................................................................27, 62

*CC Distributors, Inc. v. United States,*
    883 F.2d 146 (D.C. Cir. 1989) ..............................................................19, 21

*In re C.P. Hall Co.,*
    750 F.3d 659 (7th Cir. 2014) ................................................................19, 21

*Cargill Global Trading v. Applied Dev. Co.,*
    706 F. Supp. 2d 563 (D.N.J. 2010).............................................................44

*CMC Realty, LLC v. Fenty,*
    2010 CA 004571 B (D.C. Sup. Ct. April 25, 2011) ....................................55

*Chase Manhattan Bank v. Burden,*
    489 A.2d 494 (D.C. 1985) .....................................................................32, 33

*Cheatham v. Carter County,*
    363 F.2d 582 (6th Cir. 1966) ................................................................24, 50

*Chemstar, Inc. v. Liberty Mut. Ins. Co.,*
    42 F.3d 1398 (9th Cir. 1994) ......................................................................44

*Chidel v. Hubbard*,
   840 A.2d 689 (D.C. 2004) ................................................................................34

*In re Chocolate Confectionary Antitrust Litig.*,
   749 F. Supp. 2d 224 (M.D. Pa. 2010) ............................................................57

*Cine Sk8, Inc. v. Town of Henrietta*,
   507 F.3d 778 (2d Cir. 2007).......................................................................47, 49

*Ciralsky v. C.I.A.*,
   355 F.3d 661 (D.C. Cir. 2004)...................................................................37, 38

*Clinton v. City of New York*,
   524 U.S. 417 (1998)........................................................................................19

*Comm. of U.S. Citizens Living in Nicaragua v. Reagan*,
   859 F.2d 929 (D.C. Cir. 1988)........................................................................48

*Connecticut v. Doehr*,
   501 U.S. 1 (1991)............................................................................................45

*Corn v. City of Lauderdale Lakes*,
   904 F.2d 585 (11th Cir. 1990) ........................................................................36

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
   793 F. Supp. 2d 311 (D.D.C. 2011) ...............................................................15

*Cross v. Price Waterhouse & Co.*,
   1983 WL 1296 (D.D.C. Apr. 7, 1983) ...........................................................13

*Crown Point Dev., Inc. v. City of Sun Valley*,
   506 F.3d 851 (9th Cir. 2007)..........................................................................49

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
   432 F.3d 286 (3d Cir. 2005)...........................................................................18

*Davis v. Davis*,
   663 A.2d 499 (D.C. 1995) ..............................................................................29

*Dean v. Garland*,
   779 A.2d 911 (D.C. 2001) ..............................................................................33

*Decatur Liquors, Inc. v. District of Columbia*,
   478 F.3d 360 (D.C. Cir. 2007)........................................................................48

*District Intown Properties Ltd. Partnership v. District of Columbia*,
   198 F.3d 874 (D.C. Cir. 1999)........................................................................21

*District of Columbia v. Campbell*,
   580 A.2d 1295 (D.C. 1990) ......................................................................32, 34

*District of Columbia v. North Washington Neighbors*,
   367 A.2d 143 (D.C. 1976) ..............................................................................26

*District of Columbia v. Wical Ltd. P'ship.*,
  630 A.2d 174 (D.C. 1993) ...........................................................................................57

*District of Columbia v. World Fire & Marine Insurance Co.*,
  68 A.2d 222 (D.C. 1949) ...........................................................................................33

*Doe by Fein v. District of Columbia*,
  697 A.2d 23 (D.C. 1997) ...........................................................................................34

*Dozier v. Ford Motor Co.*,
  702 F.2d 1189 (D.C. Cir. 1983) .............................................................................30, 31

*Elkins v. District of Columbia*,
  690 F.3d 554 (D.C. Cir. 2012) ...................................................................................45

*Exxon Mobil v. Saudi Basic Indus.*,
  544 U.S. 280 (2005) ...................................................................................................27

*Fairview Vill. Dev. Corp. v. Amberhill Properties, LP*,
  99 F. App'x 87 (9th Cir. 2004) ..................................................................................59

*Foman v. Davis*,
  371 U.S. 178 (1962) ...................................................................................................13

*Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*,
  944 A.2d 1055 (D.C. 2008) ........................................................................................62

*GAF Corp. v. United States*,
  818 F.2d 901 (D.C. Cir. 1987) ...................................................................................29

*Garcia Morales v. Instituto Comercial de Puerto Rico Junior Coll.*,
  215 F.3d 1311 (1st Cir. 2000) ....................................................................................38

*Gatewood v. U.S. Cellular Corp.*,
  953 F.2d 1393 (D.C. Cir. 1992) .................................................................................59

*George Washington Univ. v. District of Columbia*,
  318 F.3d 203 (D.C. Cir. 2003) ...............................................................................43, 44

*Goss v. Lopez*,
  419 U.S. 565 (1975) ...................................................................................................42

*Hatahley v. United States*,
  351 U.S. 173 (1956) ...................................................................................................26

*Hemphill v. Miss. State Highway Comm.*,
  145 So. 2d 455 (Sup. Ct. Miss. 1962) ........................................................................50

*Heritage Common Partners v. Summit*,
  730 F. Supp. 821 (N.D. Ill. 1990) ...........................................................................23, 25

*Heritage Commons Partners v. Summit*,
  1987 U.S. Dist. LEXIS 939 (N.D. Ill. Feb. 12, 1987) ................................................20

*Hodges v. District of Columbia,*
    959 F. Supp. 2d 148 (D.D.C. 2013) ...................................................................33

*Hollingsworth v. Perry,*
    133 S. Ct. 2652 (2013)....................................................................................22

*Horne v. Dep't of Agric.,*
    135 S. Ct. 2419 (2015)................................................................................52, 54

*Ibrahim v. University of the District of Columbia,*
    742 A.2d 879 (D.C. 1999) ...........................................................................33, 34

*Independence Mgmt. Co., Inc. v. Anderson & Summers, LLC,*
    874 A.2d 862 (D.C. 2005) ...............................................................................58

*Interdonato v. Interdonato,*
    521 A.2d 1124 (D.C. 1987) ..........................................................................30, 31

*Johnson v. Fairfax Village Condominium IV Unit Owners Assoc.,*
    641 A.2d 495 (D.C. 1994) ...............................................................................33

*Johnson v. Vill. of Lansing,*
    1995 WL 54455 (N.D Ill. Feb. 7, 1995) ............................................................60

*Justice v. United States,*
    6 F.3d 1474 (11th Cir. 1993) ...........................................................................38

*Keating v. Nebraska Public Power Dist.,*
    562 F.3d 923 (8th Cir. 2009) ...........................................................................46

*Kelo v. City of New London,*
    545 U.S. 469 (2005).....................................................................................51, 54

*Kowal v. MCI Commc'ns Corp.,*
    16 F.3d 1271 (D.C. Cir. 1994) .........................................................................13

*Lance v. Dennis,*
    546 U.S. 459 (2006)........................................................................................27

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949)........................................................................................32

*Lindsey v. District of Columbia,*
    810 F. Supp. 2d 189 (D.D.C. 2011) ..................................................................33

*Lingle* [*v. Chevron USA Inc.*, 544 U.S. (2005)] ...................................................12, 49

*Louisville Joint Stock Land Bank v. Radford,*
    295 U.S. 555 (1935)........................................................................................50

*Lucas v. South Carolina Coastal Council,*
    505 U.S. 1003 (1992)................................................................................51, 53, 54

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................................16

*Lynch v. United States*,
   292 U.S. 571 (1934)................................................................................................50

*Malik Corp. v. Tenacity Grp., LLC*,
   961 A.2d 1057 (D.C. 2008) ....................................................................................59

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
   470 U.S. 373 (1985)................................................................................................31

*Marshall v. Honeywell Tech. Solutions, Inc.*,
   536 F. Supp. 2d 59 (D.D.C. 2008) .........................................................................38

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)...........................................................................................45, 46

*McAlister v. Potter*,
   843 F. Supp. 2d 117 (D.D.C. 2012) .......................................................................30

*In re McWade Properties, LLC*,
   2012 WL 5897184 (Bankr. D.D.C. Nov. 7, 2012)..............................................60, 61

*Mercado Azteca, LLC v. City of Dallas*,
   2004 U.S. Dist. LEXIS 18535 (N.D. Tex. Sept. 14, 2004)....................................20

*Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*,
   363 F.3d 1072 (10th Cir. 2004) ..............................................................................28

*Mertens v. Hewitt Associates*,
   508 U.S. 248 (1993)................................................................................................32

*Miami Building & Construction Trades Council v. Secretary of Defense*,
   493 F.3d 201 (D.C. Cir. 2007).................................................................................25

*Mirbeau of Geneva Lake LLC v. City of Lake Geneva*,
   2009 WL 1770145 (E.D. Wis. June 23, 2009).........................................................20

*Monument Realty LLC v. Washington Metro. Area Transit Auth.*,
   535 F. Supp. 2d 60 (D.D.C. 2008) .........................................................................62

*Morgan v. Barry*,
   785 F. Supp. 187 (D.D.C. 1992) ............................................................................29

*Mpoy v. Fenty*,
   870 F. Supp. 2d 173 (D.D.C. 2012) .......................................................................33

*Nat'l Life Ins. Co. v. Silverman*,
   454 F.2d 899, 905 (D.C. Cir. 1971) .......................................................................33

*News World Communications, Inc., v. Thompsen*,
   878 A.2d 1218 (D.C. 2005).....................................................................................39

*Nicholson v. Shafe,*
   558 F.3d 1266 (11th Cir. 2009) ........................................................................................28

*Northeastern Florida Chapter of Associated General Contractors*
   *of America v. City of Jacksonville,*
   508 U.S. 656 (1993)........................................................................................................20

*Owen v. City of Independence, Missouri,*
   445 U.S. 622 (1980)........................................................................................................26

*PM Servs. Co. v. Odoi Associates, Inc.,*
   Case No. 03-1810, 2006 WL 20382 (D.D.C. Jan. 4, 2006)....................................61

*Palazzolo v. Rhode Island,*
   533 U.S. 606 (2001)..........................................................................................24, 50, 51

*Patel v. Penman,*
   103 F.3d 868 (9th Cir. 1996) ........................................................................................49

*Paxton v. Washington Hosp. Ctr. Corp.,*
   299 F.R.D. 335 (D.D.C. 2014)......................................................................................13

*Payton v. United States,*
   636 F.2d 132 (5th Cir. 1981) ........................................................................................26

*Peart v. D.C. Housing Authority,*
   972 A.2d 810 (D.C. 2009) ............................................................................................32

*Penn Central Transp. Co. v. City of New York,*
   438 U.S. 104 (1978)..................................................................................................51, 52

*Perry v. Sheehan,*
   222 F.3d 309 (7th Cir. 2000) ........................................................................................29

*Philogene v. District of Columbia,*
   864 F. Supp. 2d 127 (D.D.C. 2012) ............................................................................38

*Phoenix Bond & Indemnity Co. v. Bridge,*
   477 F.3d 928 (7th Cir. 2007), *aff'd under the name Bridge v. Phoenix*
   *Bond & Indemnity Co.*, 553 U.S. 639 (2008)....................................................19, 21

*Pizzini v. Bank of Am., N.A,*
   2012 WL 1834052, at *2 (W.D. Tex. May 18, 2012) ...............................................56

*Ponder v. Chase Home Fin., LLC,*
   865 F. Supp. 2d 13 (D.D.C. 2012) ........................................................................29, 30

*Porter v. Warner Holding Co.,*
   328 U.S. 395 (1946)........................................................................................................32

*Prince Construction Co. v. D.C. Contract Appeals Board,*
   892 A.2d 380 (D.C. 2006) ............................................................................................33

*Roedler v. N. States Power Co.*,
 255 F.3d 1347 (Fed. Cir. 2001)..................................................................63

*Roman v. Nat'l Reconnaissance Office*,
 2013 WL 3388391 (D.D.C. July 9, 2013).............................................13, 14

*S. Union Co. v. Sw. Gas Corp.*,
 165 F. Supp. 2d 1010 (D. Ariz. 2001) ........................................................62

*Scott v. Dist. of Columbia*,
 101 F.3d 748 (D.C. Cir. 1996)......................................................................57

*Shea v. Clinton*,
 288 F.R.D. 1 (D.D.C. 2012)...................................................................14, 15

*Shehyn v. District of Columbia*,
 392 A.2d 1008 (D.C. 1978)...........................................................34, 35, 36

*Silverman v. Barry*,
 845 F.2d 1072 (D.C. Cir. 1988)............................................................47, 48

*Sinclair v. Kleindienst*,
 711 F.2d 291 (D.C. Cir. 1983) .....................................................................64

*In re St. Nicholace Terr.*,
 143 N.Y. 621 (1894) .....................................................................................50

*Susan B. Anthony List v. Driehaus*,
 134 S. Ct. 2334 (2014)..................................................................................16

*Thoubboron v. Ford Motor Co.*,
 809 A.2d 1204 (D.C. 2002) ..........................................................................30

*Toll Brothers, Inc. v. Township of Readington*,
 555 F.3d 131 (3d Cir. 2009)..........................................................................20

*Turner v. State of La.*,
 379 U.S. 466 (1965)......................................................................................45

*UMC Dev., LLC v. District of Columbia*,
 2015 WL 4113371 (D.C. July 9, 2015) ...............................................12, 30

*United States ex rel. Hoover v. Franzen*,
 669 F.2d 433 (7th Cir. 1982) ........................................................................48

*United States v. $515,060.42 in U.S. Currency*,
 152 F.3d 491 (6th Cir. 1998) ........................................................................58

*United States v. Gen Motors Corp.*,
 323 U.S. 373 (1945)......................................................................................50

*United States v. Kensington Hosp.*,
 760 F. Supp. 1120 (E.D. Pa. 1991) ..............................................................57

*United States v. Marolf,*
   173 F.3d 1213 (9th Cir. 1999) ............................................................................58

*United States v. Petty Motor Co.,*
   327 U.S. 372 (1946) ...........................................................................................50

*Waltz v. U.S. Department of Agriculture,*
   251 F.R.D. 491 (E.D. Cal. 2008) ......................................................................29

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...........................................................................................16

*Washington Gas Light Co. v. Public Service Commission of the District of Columbia,*
   61 A.3d 662 (D.C. 2013) ...................................................................................33

*Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.,*
   2006 WL 1147933 (D.D.C. Apr. 28, 2006) ......................................................61

*Washington v. District of Columbia,*
   429 A.2d 1362 (D.C. 1981) ...............................................................................35

*Washington v. United States,*
   366 A.2d 457 (D.C. 1976) .................................................................................30

*Watt v. Energy Action Edu. Found.,*
   454 U.S. 151 (1981) ...........................................................................................18

*Wharton v. District of Columbia,*
   666 A.2d 1227 (D.C. 1995) ...............................................................................35

*Whiteford v. Reed,*
   155 F.3d 671 (3d. Cir. 1998) .............................................................................28

*In re Wilde,* 68 A.3d 749 (D.C. 2013) ....................................................................30

*Wilderness Soc'y v. Griles,*
   824 F.2d 4 (D.C. Cir. 1987) ..............................................................................56

*Williams v. District of Columbia,*
   916 F. Supp. 1 (D.D.C. 1996) ...........................................................................34

*Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,*
   473 U.S. 172 (1985) ..............................................................................28, 36, 40

*Wolff v. McDonnell,*
   418 U.S. 539 (1974) ...........................................................................................47

## **Statutes**

28 U.S.C. § 1367 .....................................................................................................12

D.C.Code § 12-301(8) .............................................................................................37

D.C. Code § 12-309 .........................................................................................*passim*

D.C. Code § 42-815(b)...................................................................................................54, 55

D.C. Code § 44-951.15.........................................................................................................36

Fed. R. Civ. P. 8(e)(2).........................................................................................................57

Fed. R. Civ. P. 12(b)(6)...................................................................................................13, 60

Fed. R. Civ. P. 15(a) .......................................................................................................13, 15

Fed. R. Civ. P. 15(c).......................................................................................................38, 39

Fed. R. Civ. P. 15(d) ...........................................................................................................15

**<u>Miscellaneous</u>**

Dan B. Dobbs, Law of Remedies § 4.1(1), at 557 (2d ed. 1993)..................................32

Craig A. Olson, Do Workers Accept Lower Wages in Exchange for Health Benefits?,
   20 J. Labor Economics S91 (2002), *available at* http://goo.gl/dqRrke
   (visited October 11, 2015) ...........................................................................................19

Restatement (Second) of Contracts § 302(1)(b) cmt. (d)..............................................63

Alan Wright & Arthur R. Miller, Federal Practice and
   Procedure § 4469.1 (2d ed. 2002)..............................................................................28

Plaintiffs UMC Development, LLC and Jacksophie GSCH, LLC (collectively, the "Developers"), on May 31, 2013, sued, among others, the District of Columbia and Mayor Vincent Gray[1] (collectively, the "District"), as well as the Not-For-Profit-Hospital Corporation ("NFPH") (together with the District, "Defendants"), alleging ten causes of action.[2]  The Developers have moved for leave to file a Second Amended Complaint (*see* ECF 62); Defendants have opposed the motion and separately moved to dismiss all of the Developers' claims (*see* ECF 70-72).  The Developers hereby respectfully submit this consolidated brief in reply in support of their motion for leave to amend and in opposition to the motion to dismiss. For all of the reasons stated herein, Defendants' motions to dismiss should be denied.

## INTRODUCTION

By any fair measure, this lawsuit should be heard and adjudicated on its substantial merits, with the benefit of a factual record.  Granting leave for the Developers to amend and denying Defendants' threshold motions to dismiss will enable that to happen.

This action arises out of the District's wrongful foreclosure on the United Medical Center (the "Hospital") and its surrounding real property (the "Land") and the improprieties that tainted those proceedings—proceedings that the District's own lawyers have conceded were unlawful and taken contrary to the advice of legal counsel.  Instead of confronting these facts, the District endeavors to spin its own facts and encourages the Court to side with the District on factual disputes (a task inappropriate at this stage of the proceeding) in an effort to create a post-hoc justification for the foreclosure that it has already admitted was wrongful.  The Court should not

---

[1]   Mayor Muriel Bowser has since been substituted for Mayor Gray as a party.

[2]   In their original complaint, the Developers also sued Specialty Hospital of Washington-GSE Holdings, LLC and CMC Realty, LLC.  The claims against those defendants have been resolved by the parties.  Specialty Hospital of Washington-GSE Holdings, LLC and CMC Realty, LLC therefore are not parties to the Developers' Second Amended Complaint. Nine causes of action remain against Defendants.

credit these efforts, much less grant threshold dismissal before the facts can be properly developed and the merits adjudicated.

The genesis of this action dates back to 2007 when the District provided Specialty Hospitals of America, LLC ("SHA") with at least $49 million in public funding, based on SHA's assurances that it would turn around the nearly insolvent Hospital. Part of the District's plan to save the Hospital called for the development of the surrounding Land. To that end, the District, SHA, and the Developers all agreed that the Developers would develop the Land and become its rightful owner. Based on promises from SHA, as well as the District, the Developers entered into agreements and made significant investments in the Land for its intended use and development, including survey and subdivision, as well as generating master development plans. In the years that followed, the Developers' investments began to pay dividends when they started to earn rental income from a tenant on the Land.

Those investment returns, along with all of the Developers' other rights associated with its rightful ownership of the Land, were extinguished, however, when the District unlawfully foreclosed on the Land in 2010 after it became disenchanted with SHA's maintenance of the Hospital. The District itself acknowledged the impropriety of the foreclosure in an internal e-mail that later became public, and a fixture of this Court's docket. In the e-mail, then-Deputy Attorney General Ellen Efros writes to then-Attorney General Irvin Nathan that the District's decision-makers, including the Mayor's office, proceeded with the foreclosure despite having been advised that it would be unlawful:

> This case has never been anything for those on the front lines other than a political nightmare from the very inception when we started the foreclosure (***against our advice***). You ask us to go defend the fallout and it just is not that easy. All I was stating was the obvious . . . -- ***we are going to be sued for breach and will have no defenses*** . . . . Again, I apologize if you viewed my comments as lecturing or

> intemperate, but I am also upset because this was reviewed at the[]
> highest levels by the CA [City Administrator] and EOM [Executive
> Office of the Mayor] and **no one ever sa[id] "no" or "slow down**."

*See* Second Amended Complaint ("SAC"), ECF 62-1 ¶ 14 (emphases added).  Thus, despite

knowing that it had no authority to foreclose on the Land, the District exercised rights that it did

not actually hold, and wrongfully foreclosed on the property at the expense of the Developers.

As a result of the District's actions, the Developers were stripped of any and all rights to

this valuable Land, in which the Developers had been induced to invest by the District.  To this

day, the District persists in claiming the benefit of the foreclosure despite acknowledging that the

foreclosure was wrongful.  Accordingly, the Developers are pursuing their suit against

Defendants for, among other things, the wrongful and unlawful foreclosure on, taking of, and

persisting unfounded claim to the Land.  In this action, the Developers seek rescission of the

foreclosure and declaration of their persisting rights.  Alternatively, the Developers seek just

compensation for the taking of property as guaranteed by the Fifth Amendment and/or

compensation for the District's breach of contract for which they were a third-party beneficiary.

A few months ago, the D.C. Court of Appeals ruled that specified omissions in the

Developers' initial pleadings—such as that they had not pleaded clearly enough the rental

income they had been earning from the Land—deprived them of standing to sue in the local D.C.

courts.  Accordingly, the D.C. Court of Appeals directed the case to be dismissed for lack of

jurisdiction.  That ruling by no means controls the Court's disposition here.  The D.C. Court of

Appeals did not rule on the merits.  Instead, it explicitly ordered the dismissal to be without

prejudice to lawsuits in other forums.  Moreover, the Developers' Second Amended Complaint

makes exceedingly clear the facts giving rise to Article III standing (such as the lost rental

income).  It is therefore appropriate for this Court to grant leave to amend and to deny dismissal,

thereby permitting fair factual development surrounding the important questions raised and

enabling ultimate adjudication of those questions on their merits.

## FACTUAL BACKGROUND

**Background of the Hospital**

In 2007, following years of mismanagement and ownership changes, the Greater

Southeast Community Hospital (today known as United Medical Center, hereinafter the

"Hospital") became the subject of increasing concern, particularly because the Hospital was on

the brink of losing national accreditation and becoming insolvent.  SAC ¶ 14.  The District

undertook aggressive efforts to find a new owner for the Hospital, with SHA and its principals

(collectively, the "SHA Entities") emerging as the most likely candidates, despite fears that SHA

was not financially capable of taking over the struggling Hospital.  *Id.* ¶¶ 16–19.

The District ultimately chose SHA as the new owner, providing it with $79 million in

public grants and loans through which the SHA Entities would acquire the land, the existing

building, and other assets constituting the Hospital.  *Id.* ¶ 17.  The funding scheme authorized the

District to enter into a limited partnership agreement (the "Partnership Agreement," attached as

Exhibit 2 to the District's Motion to Dismiss (ECF 72-2)) with Specialty Hospital of

Washington-GSE Holdings, LLC ("SHW-GSE")—a wholly owned subsidiary of SHA.  *Id.* ¶ 18.

The partnership was called Greater Southeast Investments, L.P. ("GSI" or the "Partnership") and

consisted of two partners:  SHW-GSE and the District.  *Id.* ¶ 21.  SHW-GSE was the sole general

partner and the District was the sole limited partner.  *Id.*  As the limited partner, the District had

no power to take part in the operation, management, or control of the Partnership.  *Id.* ¶ 23.

Meanwhile, the SHA Entities established a network of limited-liability companies through which

they attempted to shield themselves from liability, including Capitol Medical Center ("CMC"),

which the SHA Entities intended to use as the operating entity for the Hospital, and CMC Realty, which was to own the real property itself along with the Land.  *Id.* ¶ 24.

On November 7, 2007, GSI entered into various loan agreements and notes with CMC and CMC Realty (the "Notes"), through which GSI extended $49 million in loans to CMC and CMC Realty.  *Id.* ¶ 25.  The District did not itself directly lend funds to CMC or CMC Realty, nor was it a party under the Notes.  *Id.*  The Notes were secured by a Deed of Trust, which granted GSI (as beneficiary under the Deed of Trust) a security interest in the real property containing and surrounding the Hospital, including the Land.  *Id.* ¶ 27.  The Deed of Trust provided that, in the event of a default by CMC or CMC Realty, GSI had a right to foreclose on the secured property.  *Id.* ¶ 28.  As the limited partner of GSI, the District had no independent authority to declare a default, effect a foreclosure, or otherwise enforce the Notes.  *Id.*

**The Developers Become Involved in the Hospital**

Because CMC Realty did not have adequate resources or capital to develop the Land, CMC Realty and SHA Entities approached Jacksophie to propose a joint venture for developing the Land as contemplated and supported by the District in connection with GSI.  *Id.* ¶ 29.  Thus, on or about November 5, 2007, Jacksophie and SHW-GSE entered into the Greater Southeast Development, LLC Operating Agreement ("Operating Agreement") to establish a joint venture that was initially known as Greater Southeast Development, LLC, and later became known as UMC Development.  *Id.* ¶ 30.  Jacksophie, as the manager of the joint venture embodied in UMC Development, was to own a sixty-five percent (65%) interest, leaving SHW-GSE to own the remaining thirty-five percent (35%) interest.  *Id.*  CMC Realty joined in the Operating Agreement to confirm its obligations thereunder, which included its obligation to transfer to UMC Development title to the Land.  *Id.* ¶ 33.

Even prior to the formal creation of UMC Development, Jacksophie took steps to prepare the Land for development. *Id.* ¶ 34. Specifically, a few months before the execution of the Operating Agreement, Jacksophie conducted a lengthy survey of the property. *Id.* The survey, which took several months to complete and cost thousands of dollars, established the Land's meets and bounds and identified any easements or rights of way that encumbered the property. *Id.* Satisfied that the Land was sufficiently unencumbered, Jacksophie proceeded with the creation of the joint venture that established UMC Development. *Id.*

Upon execution of the Operating Agreement, the Developers continued their efforts to develop the Land. *Id.* ¶ 35. The next step was to sub-divide the property by obtaining multiple assessment and tax lots ("A&T Lots") from the District. *Id.* ¶ 36. When the Operating Agreement was executed, the Land consisted only of Lots 3 and 4 in Square 5919 according to the District's tax records. *Id.* The Operating Agreement, however, required that the Developers apply for two or more separate A&T Lots. *Id.* Thus, on November 5, 2007, CMC Realty, on the Developers' behalf, sent a letter to the District requesting that it approve the formation of the four separate A&T Lots on the Land for the benefit of the Developers. *Id.*

On November 20, 2007, Konrad Schlater ("Schlater"), former Special Assistant to the Deputy Mayor for Planning and Economic Development, recommended to Peter Nickles ("Nickles"), former General Counsel to then-Mayor Fenty, that he approve the formation of the four requested A&T Lots. *Id.* ¶ 37. In doing so, Schlater recognized that "[t]he formation of A&T Lots is a necessary pre-requisite to any medical-related development on the [Land]"— development the District contemplated to be completed by the Developers. *Id.* On or around November 5, 2007, Nickels accepted Schlater's recommendation and approved the creation of the four A&T Lots (0801, 0802, 0803, and 0804). *Id.* ¶ 38.

The survey and the sub-division of the Land were just the beginning of the Developers' efforts to develop the property. *Id.* ¶ 39.  Indeed, prior to and following the receipt of the four A&T Lots, the Developers held regular weekly meetings with representatives of the District, including Nickels, Schlater, and Neil Albert, former Deputy Mayor for Planning and Economic Development, as well as representatives from SHA to discuss the Developers' plans. *Id.*  At each and every meeting, the District, through its representatives, encouraged the Developers to continue their ongoing development efforts. *Id.*  The Developers proceeded accordingly. *Id.*

In September 2008, the Developers put out a Request for Qualifications ("RFQ") seeking qualified candidates to submit development proposals for the Land. *Id.* ¶ 40.  The RFQ generated substantial interest among architects and designers. *Id.*  Between October 2008 and November 2008, the Developers received nine submissions from various entities. *Id.*  After a careful and extensive review, the Developers ultimately selected Perkins + Will to develop conceptual master plans for the Land. *Id.* ¶ 41.  Following its selection, Perkins + Will worked collaboratively with the Developers to develop comprehensive redevelopment plans for the Land—plans that were shared with the District on several occasions. *Id.*  In doing so, the Developers played an integral role in contributing expertise and insight into how the Land could be developed for the benefit of the Hospital and surrounding land. *Id.*  By the end of 2008, the Developers had sunk nearly $80,000 of investment into their development efforts. *Id.* ¶ 42.

The parties continued on track through 2009. *Id.* ¶ 43.  That year, the Developers continued their weekly meetings with the District, as well as regular meetings and discussions with Perkins + Will, and other consultants. *Id.*  During these meetings, the Developers continued to provide valuable expertise and insight into how the Land would be developed. *Id.*  Ultimately,

by the end of 2009, the Developers invested an additional $58,000 into their development efforts. *Id.* That same year, the Developers started to see an initial return on their investment. *Id.*

On June 1, 2009, the Developers signed a lease agreement with GSE Holdings, LLC ("GSE"), an entity controlled by SHA, for commercial space on the Land. *Id.* ¶ 44. GSE, which operated an MRI center, was obligated under the lease agreement to pay the Developers annual rent in the amount of $63,431.52. *Id.* Rent was to be paid on a semi-annual basis on the first of January and July each year. *Id.* GSE paid its first installment of rent, approximately $31,000, to the Developers on or about October 8, 2009. *Id.* The next rent payment in the amount of $31,730.77 was due on January 1, 2010, but GSE failed to pay it. *Id.* On January 20, 2010, the Developers sued in D.C. Superior Court to recover the rent. *Id.*; *see UMC Development LLC v. GSE Holdings, LLC*, 2010 LTB 002230 (D.C. Sup. Ct.). On February 26, 2010, the court ordered GSE to pay the Developers $34,015.52 for past rent and fees. *See UMC Development LLC v. GSE Holdings, LLC*, 2010 LTB 002230 (D.C. Sup. Ct., Feb. 26, 2010).

In addition to the lease with GSE, the Developers also maintained an interest in another leasehold on the Land. SAC ¶ 45. Bio Medical Applications of Southeast Washington, a kidney dialysis center, rented space on the Land from CMC and SHW-GSE through a pre-existing lease. *Id.* When CMC and SHW-GSE failed to properly account to the Developers for monies arising from the lease, which included rental obligations, the Developers filed a lawsuit in D.C. Superior Court on December 11, 2009. *Id.*; *see UMC Development, LLC v. Specialty Hospital of Washington-GSE Holdings, Inc.*, 2009 CA 009233 B (D.C. Superior Ct.). After initially being awarded a default judgment against CMC and SHW-GSE, the Developers ultimately resolved the matter through a settlement agreement. *See UMC Development, LLC v. Specialty Hospital of Washington-GSE Holdings, Inc.*, 2009 CA 009233 B (D.C. Sup. Ct. June 16, 2011).

8

That same year, the Developers were also on the brink of closing a lucrative lease agreement that would have made CVS an anchor tenant on the Land.  SAC ¶ 46.  On June 29, 2009, the Developers and CVS executed a Letter of Intent for the lease of 85,377.6 square feet of commercial space.  *Id.*  Under the proposed twenty-five year lease, CVS would have paid the Developers $180,000 in annual rent and no less than $4.5 million over the life of the lease.  *Id.* Although the deal never closed, it confirms the legitimate commercial interest in the Land and the potential returns the Developers reasonably expected to derive therefrom.  *Id.*

Through the Developers' regular weekly meetings with the District, as well as through frequent letter correspondence, the District was well-aware of the progress the Developers had made developing the Land, including the potential CVS deal the Developers negotiated, the rental income the Developers received from GSE, and the other pre-development activities undertaken by the Developers (*i.e.*, the survey, the sub-division, and the RFQs).  *Id.* ¶ 47.  At no point prior to the July 2010 foreclosure did the District ever indicate to the Developers that it did not intend to approve the transfer of title from CMC Realty to the Developers.  *Id.* ¶ 48.  It never said "stop" or "slow down."  *Id.*  To the contrary, the District actively encouraged the Developers to continue their development activities every step of the way and assured them that the District's approval for transfer of title would promptly be forthcoming.  *Id.*  The Developers therefore retained every reasonable expectation of continuing to derive fair returns on their investment and contributions over the course of the ensuing life of the property, which was expected to appreciate in value and to throw off continuing returns over the course of decades.  *Id.*

And it was not just the District that recognized the Developers as the rightful owners of the Land.  CMC Realty, CMC, and SHA did too.  *Id.* ¶ 49.  On March 12, 2008, CMC Realty wrote to the District asking it to approve transfer of the A&T Lots to the Developers.  *Id.*  On

April 24, 2008, the District responded that it "anticipates the development of additional improvements on the Land" and that it "fully supports development initiatives that will benefit the community and its citizens." *Id.* ¶ 50.  The District requested that the Developers provide it with additional information about their development plans so that it could learn more about the Developers' proposals. *Id.*  The Developers provided this information, making the District fully aware of the plans and expectation of future returns. *Id.*  Although the Developers supplied the District with this information, the District never formally responded to CMC Realty's request to transfer title to the Land. *Id.* ¶ 51.  Nevertheless, the District continued to assure the Developers at their regular weekly meetings that it would, in fact, approve the transfer of title. *Id.*

**The District's Efforts to Foreclose on the Hospital**

Meanwhile, shortly after the SHA Entities took control of the Hospital, the District declared the Hospital to be in imminent financial danger. *Id.* ¶ 52.  Then, on April 12, 2010, the District unilaterally declared a default under the Deed of Trust. *Id.* ¶ 67.  It issued a Notice of Default and Acceleration of Maturity and Notice of Entry on the Property, claiming that the SHA Entities failed to make required loan payments in 2009, had failed to disclose material facts to GSI, and had committed fraud against GSI. *Id.*  That same day, the District issued a Notice of Entry on the Property and assumed all control over the Hospital and the Land. *Id.* ¶ 68.

On June 3, 2010, the District filed a Notice of Foreclosure, setting July 9, 2010, as the sale date for the Hospital. *Id.* ¶ 72.  The Notice of Foreclosure held the District (not GSI) out as the "Holder of the Note." *Id.* ¶ 74.  In actuality, GSI, not the District, held the note. *Id.* ¶ 75.  The GSI Partnership had neither been dissolved nor otherwise amended; and the District, as limited partner of GSI, had no authority to foreclose or to otherwise act on GSI's behalf. *Id.* ¶ 76.

On July 9, 2010, the District purported to acquire the Land pursuant to the Notice of Foreclosure at what it characterized as an "auction."  *Id.* ¶ 78.  In reality, the foreclosure sale was a sham, designed by the District to ensure that it would be the only bidder, able to acquire the Hospital and the Land for a fraction of its actual market value.  *Id.* ¶ 78(a)-(d).  Ultimately, the District was the only participant at the "auction," and it acquired the Hospital and the Land at a price grossly below market value, effectively denying the Developers appropriate returns to which they should have been and, indeed, were entitled.  *Id.* ¶ 79

Following the District's acquisition of the Hospital, then-Mayor Fenty issued an Order on July 12, 2010, transferring the assets purchased by the District at the foreclosure auction to NFPH.  *Id.* ¶ 80.  After taking control of the Hospital and the Land, the District used more public monies to pay various of these entities' debts to creditors, without offering any compensation to the Developers for the injuries they suffered. *Id.* ¶ 83.  Despite knowing better internally, the District has claimed externally that it has "undisputed title to the property," including the Land. *Id.* ¶ 84.

## PROCEDURAL BACKGROUND

The Developers filed this lawsuit against the District and related parties in D.C. Superior Court on May 31, 2013, bringing both federal-law claims and state-law claims.  After the District removed the action to this Court on June 14, 2013 (*see* ECF 1), the Developers moved to remand.  *See* ECF 6.  Ultimately, the Court remanded the Developers' state-law claims to D.C. Superior Court, retained jurisdiction over the federal claims, and stayed the case pending resolution of the D.C. Superior Court proceeding.  *See* ECF 28 & 45.

On January 14, 2014, the D.C. Superior Court dismissed with prejudice all of the Developers' state-law claims for lack of jurisdiction.  The Developers appealed, and on July 10, 2015, the D.C. Court of Appeals affirmed the dismissal on the ground that the Developers had

failed to allege sufficient facts in their Complaint to establish standing in D.C. Superior Court. The D.C. Court of Appeals also concluded that, because it was jurisdictional, the dismissal order should be without prejudice.  The court emphasized the narrowness of its ruling:  "Having concluded that the Superior Court lacked subject matter jurisdiction to hear the developers' claims, we cannot reach beyond that determination to consider whether those claims would be meritorious if the defect in standing were cured—that is, were the developers' complaint dismissed without prejudice and were they to utilize the opportunity (assuming such opportunity still exists) to file a new complaint." *UMC Dev., LLC v. District of Columbia*, 2015 WL 4113371, *8 (D.C. July 9, 2015).  Consistent with those explicit parameters, the D.C. Court of Appeals ordered the case remanded to the D.C. Superior Court to amend the dismissal order so that it would be without prejudice to being refiled elsewhere (such as in this Court).  On August 13, 2015, the D.C. Superior Court amended the dismissal order to be without prejudice, pursuant to the mandate of the D.C. Court of Appeals.

With the D.C. Court of Appeals' affirmance of the dismissal (without prejudice) of the Developers' state-law claims, the Developers have exhausted their state-court remedies (which is a prerequisite for their takings claim under the Fifth Amendment).  One of the reasons the Developers now seek this Court's leave to amend their complaint is to add the allegations concerning their exhaustion of available state-law remedies.  Besides providing these additional facts, the Second Amended Complaint also reinstates certain of the Developers' state-law claims against Defendants that were dismissed without prejudice.  Because the D.C. state courts have indicated their unwillingness to adjudicate these claims on the merits, the Developers submit that it is now appropriate for this Court to exercise its supplemental jurisdiction under 28 U.S.C. § 1367 over these claims so that they can be fairly heard and decided on the merits.

12

**ARGUMENT**

In seeking to dismiss the Developers' claims, Defendants urge this Court to disregard the well-pleaded allegations in the Second Amended Complaint and to ignore controlling Supreme Court precedent. When considering a motion to dismiss, however, "a judge must accept as true all of the factual allegations contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009), and grant a plaintiff "the benefit of all inferences that can be derived from the facts alleged," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Moreover, a complaint need contain only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is facially plausible when the facts of the complaint will allow the court to make a reasonable inference that the defendant is liable for the alleged misconduct." *Roman v. Nat'l Reconnaissance Office*, 2013 WL 3388391, *2 (D.D.C. July 9, 2013). Here, the Developers' Second Amended Complaint alleges facts that do much more than support an inference of Defendants' liability—they all but foreclose any viable defense on liability. Accordingly, the Court should permit the Developers to file their Second Amended Complaint and should, simultaneously, deny Defendants' motions to dismiss.

Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleadings with leave of the court and that the court "should freely give leave when justice so requires." *Accord Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[T]he leave sought should, as the rules require, be 'freely given.'"). "Rule 15 reflects one of the basic policies of the federal rules—that pleadings are not an end in themselves but are only a means to assist the presentation of a case to enable it to be decided on the merits." *Cross v. Price Waterhouse & Co.*, 1983 WL 1296, at *2 (D.D.C. Apr. 7, 1983). Motions for leave to amend should presumptively be granted. In this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason." *Paxton v.*

*Washington Hosp. Ctr. Corp.*, 299 F.R.D. 335, 335 (D.D.C. 2014). The burden rests on the non-movants—in this case, Defendants—to "persuad[e] the court to deny leave to amend." *Id.* (internal quotations omitted). The Defendants cannot carry that burden here.

## I.      LEAVE TO AMEND THE COMPLAINT SHOULD BE GRANTED

Given the liberal standard for granting leave to amend and the preliminary posture of this case, in which discovery has yet to begin, Defendants have no good basis for opposing leave to amend. They nonetheless offer two: (1) futility (*see* ECF 72-1 ("District Mot.") at 1; ECF 70 ("NFPH Mot.") at 9–14); and (2) delay (*see* NFPH Mot. at 22–23).

The Developers' proposed amendment would not be futile. The Second Amended Complaint establishes beyond a doubt that the District's foreclosure amounted to a confiscation of the Developers' property interests (including their contractual rights to the Land, their rental income from the Land, and their investments in the Land), thereby giving the Developers Article III standing to sue the District and to obtain adjudication of an actual "case or controversy." And the subsequent sections of this brief—which refute, point-by-point, the dizzying array of arguments raised by the Defendants in their desperate attempt to have this case dismissed without being heard on the merits—show that the Developers' claims are meritorious, not futile.

Nor have the Developers been dilatory in pursuing their claims. In evaluating delay in the context of a proposed amendment, the Court should consider "the length of delay between the latest pleading and the amendment sought and whether the amendment would unduly increase discovery or delay the trial." *Shea v. Clinton*, 288 F.R.D. 1, 4 (D.D.C. 2012). Here, the Developers filed their First Amended Complaint on November 4, 2013. *See* ECF 33. Shortly thereafter, however, this Court, on December 5, 2013, stayed the case pending resolution of the Developers' state-law claims in D.C. Superior Court. *See* ECF 45. During the stay, the parties were expressly prohibited from "fil[ing] anything substantive on this Court's docket until the

stay has been lifted." *Id.* 2 n.1.  The Developers were therefore prohibited from moving to amend until the local D.C. courts finished with the case.

In parallel, the Developers diligently pressed forward in D.C. state court with their state-law claims until those were ultimately dismissed without prejudice by the D.C. Superior Court on August 18, 2015.  The Developers then promptly returned to this Court on September 8, 2015, when they moved for leave to file the Second Amended Complaint.  *See* ECF 62.  The new allegations in this amended complaint spell out exquisitely the facts underlying the claims in this case; they "fine-tune the basis for the relief [the Developers] seek in this action."  C*ouncil on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 324 (D.D.C. 2011).  "Factual allegations of this kind, which clarify but do not reshape the action, are rarely a bad thing."  *Id.* (permitting amendment "to add a handful of allegations that are designed to flesh out the factual basis for the claims they have already asserted").  Thus, far from delaying, the Developers have diligently pursued their claims in this Court.  Nor have the Developers' actions in any way increased discovery burdens or delayed trial.  The parties have not yet engaged in any discovery whatsoever, let alone scheduled a trial date.  In sum, Defendants have not come close to carrying their burden to show special grounds for denying leave to amend at this early stage.[3]

---

[3]  NFPH also contends that the Developers' motion for leave "improperly conflates" Rule 15(d)'s supplementation standard with Rule 15(a)'s amendment standard.  NFPH Mot. at 13.  The Developers did no such thing.  To be clear, the Developers have moved under both Rule 15(a) and Rule 15(d) for leave to amend and to supplement, respectively.  *See* ECF 62. Specifically, the Developers have moved under Rule 15(a) to amend in order to add more specific facts concerning the rental income the Developers earned from the Land, the amount of time and money the Developers spent developing the Land, and the repeated promises the District made to the Developers that it would approve transfer of title to the Land, and similar facts that existed before the First Amended Complaint was filed.  The Developers' separate request to supplement under Rule 15(d) seeks to add new allegations concerning facts arising after the filing of the First Amended Complaint—namely that the Developers exhausted the available state-court options in attempting to obtain just compensation for the District's taking of their property.

## II.     THE DEVELOPERS HAVE ARTICLE III STANDING

There should be no serious question of Article III standing in this case.  "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Defendants contend that the Developers lack standing because they failed to satisfy any of the cornerstones for standing.  *See* District Mot. at 15–28; *see also* NFPH Mot. at 14–22.  To show standing, a plaintiff must "allege such a personal stake in the outcome of the controversy as to warrant [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [their] behalf."  *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975).  The burden of proof is less demanding when standing is confronted at the motion-to-dismiss stage.  *See Defenders of Wildlife*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." (internal quotations omitted)).  Here, the Developers' allegations easily satisfy this less demanding standard as the Developers, the rightful owners of the Land, have alleged a personal stake in the outcome of the controversy by demonstrating that the District's foreclosure and foreclosure "auction" extinguished valuable interests and existing rights in the Land.

### A.     The Developers' Complaint Demonstrates Multiple Injuries-in-Fact.

The Developers suffered an Article III injury when the District stripped them of any and all of their rights to this valuable Land—including their established, contractual rights to develop the Land and to continue deriving rent from it—and also appropriated for itself the valuable investments the Defendants had made in the Land.  The Developers were further injured by the

16

District's foreclosure "auction," the procedures of which were rigged to favor the District and to deny the Developers their interest in the Land.

### 1.      The Developers Lost Their Existing Interests In The Land.

The District incorrectly argues that the Developers' allegations are insufficient to confer standing because their interest in the Land "was, at most, a future conditional interest . . . that never vested, and could never vest, as the District never authorized transfer of this property to UMC Development."  District Mot. at 36.  Specifically, the District argues that, because consent from the District was required for CMC Realty to convey the Land, the Developers "had nothing more than a unilateral expectation that the terms of the Operating Agreement would be fulfilled." *Id.* at 15.  NFPH makes a similar argument.  NFPH Mot. at 32.  These arguments, however, ignore the Developers' loss of preexisting rights and interests—including their established, contractual rights to develop the Land and to continue deriving rent from it—that were not subject to the District's approval and that were established well before the District foreclosed.

At the time of foreclosure, the Developers had already perfected—via contract, litigation in the D.C. courts, and otherwise—the right to earn rental payments and other profit from developing the Land, *irrespective of whether they held title*.  *See* SAC ¶¶ 44–46.  In particular, on June 1, 2009, the Developers signed a lease agreement with GSE Holdings, LLC ("GSE"), an entity controlled by SHA, for commercial space on the Land.  *Id.* at ¶ 44.  GSE, which operated an MRI center, paid the Developers annual rent in the amount of $63,431.52.  *Id.*  Moreover, based on the District's assurances that title would transfer, the Developers had also spent tens of thousands of dollars on developing the Land.  *Id.* at ¶¶ 34; 42; 43.

Thus, whatever additional value the Developers would have derived from obtaining actual, formal title, it was by no means the only source of value to them, or the only thing they lost when the District wrongfully foreclosed on the Land.  The UMC Development Operating

Agreement already gave them the right to profit from the buildings they constructed, developed, and leased on the Land, even though they did not yet have title—and even if they never received title.  When the District foreclosed on the Hospital, it clearly and concretely injured the Developers by purporting to wipe out these established contractual rights, usurp their investments and rental income, and dash their expectations of future returns.  By fixating on the Developers' ultimate entitlement to transfer of title, which is only one of the rights and interests identified in the Second Amended Complaint, the Defendants ignore the remainder of the Developers' injuries in fact.  *See, e.g.*, *Watt v. Energy Action Edu. Found.*, 454 U.S. 151, 160-61 (1981) (usurping another's monetary returns is an injury in fact); *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291-94 (3d Cir. 2005) (losses of money and invasions of property rights are injuries in fact); *Adams v. Watson*, 10 F.3d 915, 920–25 & n.13 (1st Cir. 1993).[4]

## 2.     The Developers Lost Their Conditional Interest In Obtaining Title.

Even focusing solely on the Developers' claimed entitlement to transfer of title, however, injury in fact should be beyond question for purposes of threshold standing.  Defendants conflate "conditional" with "non-existent."  That a particular property interest is *conditional* does not mean that such an interest is so speculative or conjectural that it must be dismissed at the threshold.  If it did, then *no* conditional interest could ever be litigated on the merits, for no plaintiff would ever have standing even to bring it to court.  That is simply not the law.

---

[4]   Defendants contend that the Developers' rental proceeds are insufficient because the Developers had no "right to enter into" these lease agreements.  District Mot. at 17; *see also* NFPH Mot. at 18.  This argument rings hollow.  Especially at the pleadings stage, Defendants cannot deny that the Developers were, *in fact*, earning rental income, and the loss of that income is undeniably an injury in fact for Article III purposes.  Moreover, the District was well aware at the time that the Developers were earning rental income from the Land.  SAC ¶ 47.  Had it truly believed the lease agreements were unlawful, it would have told the Developers back then, in 2009.  Yet it did not do so; to the contrary, the District *actively encouraged* the Developers to continue their development activities.  SAC ¶ 48.  It is only now that the Defendants have appropriated the Land for themselves and want to keep its profits that they have adopted their new (and unconvincing) stance.

It should not be surprising that conditional interests are routinely heard and adjudicated on their merits.  A future interest—even one that is conditional—has real present value. Consider health insurance.  Employees value health coverage and accept it in lieu of wages, even though insurance payouts are contingent on the future use of specified medical services.  *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2776 (2014); Craig A. Olson, Do Workers Accept Lower Wages in Exchange for Health Benefits?, 20 J. Labor Economics S91 (2002), *available at* http://goo.gl/dqRrke (visited October 11, 2015).[5]  The same holds for a parade of valuable instruments with contingent payoffs:  fire insurance, credit default swaps, unvested stock options, and so on.  All contingent interests in future rewards have a present "expected value"—the value the interest-holder expects to receive—and the loss of this expected value "suffices for Article III standing."  *In re C.P. Hall Co.*, 750 F.3d 659, 660–61 (7th Cir. 2014).

Thus, by itself, the Developers' loss of a contingent interest in obtaining title to the Land is an Article III injury.  Indeed, wrongful deprivation of the expected value of a potential future return is an injury in fact *even when the plaintiff has no property interest whatsoever* and instead merely has an opportunity to profit.  The "loss of a (valuable) chance is real injury."  *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 930 (7th Cir. 2007).  "[A] plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit—such as a [government] contract—even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity."  *CC Distributors, Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) (emphasis in *CC Distributors*); *accord, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 432–33 & n.22 (1998) (canceling a tax credit that an organization might have used to buy a facility causes injury in fact, irrespective of whether the

---

[5]   For simplicity, we shrunk unwieldy links with Google's URL shortener, http://goo.gl/.

organization actually would have bought the facility); *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (inhibiting a bid for a government contract causes injury in fact, irrespective of whether bidder would have prevailed).

The same reasoning and result obtain for would-be developers of a particular property. The Supreme Court made this point crystal clear in *Arlington Heights v. Metropolitan Housing Development Corporation*, where it held that a village's refusal to rezone land that a developer had specific plans to develop was an injury in fact because it rendered the developer's plans "worthless" and frustrated the "specific project [the developer] intends to build." 429 U.S. 252, 262–63 (1977). Neither the fact that the developer was "not the owner of the property in question," nor the fact that other "uncertainties," such as "financing," might have torpedoed the development plans diminished the developer's standing. *Id.* at 261–62.

In other words, when a developer expends time and resources preparing to develop specific property, as the Developers did here with the Land, the frustration of those development plans is an Article III injury in fact because it cuts off the developer's expected returns. That is true even if the developer does not own the site, and even if the development plans might not have come to fruition for other reasons. *E.g.*, *Toll Brothers, Inc. v. Township of Readington*, 555 F.3d 131, 138–42 (3d Cir. 2009) (collecting cases); *ACORN v. County of Nassau*, 2006 U.S. Dist. Lexis 50217, at *24–29 (E.D.N.Y. July 21, 2006); *Mercado Azteca, LLC v. City of Dallas*, 2004 U.S. Dist. Lexis 18535, at *12–14 (N.D. Tex. Sept. 14, 2004); *Heritage Commons Partners v. Summit*, 1987 U.S. Dist. Lexis 939, at *7 n.2 (N.D. Ill. Feb. 12, 1987); *Mirbeau of Geneva Lake LLC v. City of Lake Geneva*, 2009 WL 1770145, *3 (E.D. Wis. June 23, 2009).

When the District foreclosed on the Land, the Developers held a "valuable" property interest in obtaining title to the Land (*see* SAC ¶¶ 2; 109; 130), had crafted development plans and undertaken "significant" and "substantial" investments based on that property interest (*see id.* ¶¶ 34–46; 92), and had been deriving and expected to continue to derive profit from the interest (*see id.* ¶¶ 44–48). The destruction of the Developers' property interest is thus undeniably an injury in fact, as *Arlington Heights* and the other cases cited above make clear.[6]

### 3. The Developers Were Injured By The Sham Foreclosure Sale.

The Developers were also injured by the District's illegal foreclosure sale. By structuring the foreclosure auction to exclude all bidders other than itself, the District denied the Developers the valuable opportunity to purchase the Land (*see* SAC ¶¶ 78; 88-89), and it depressed the auction price, thereby denying the Developers their right to recover any surplus reaped from the auction (*see id.* ¶¶ 79; 90). Denial of an opportunity to participate in a government bidding process is undeniably an injury in fact under *CC Distributors*, 883 F.2d at 150. Likewise, the loss of the chance to profit from the auction is an injury in fact under *In re C.P. Hall*, and other cases that hold that the "loss of a (valuable) chance is real injury." *Phoenix Bond*, 477 F.3d at 930.

---

[6] The District cites *District Intown Properties Ltd. Partnership v. District of Columbia*, 198 F.3d 874, 883 (D.C. Cir. 1999), to argue that the Developers' investments in the Land were not reasonable and therefore insufficient to establish an injury-in-fact. In *District Intown Properties*, however, the court found that "the claimant surely must point to some action beyond mere purchase to establish the reasonableness of its expectations." *Id.* at 883. Here, the Developers' actions were based on much more than some unsupported speculation that title to the Land would transfer; instead they were based on *the District's repeated promises and assurances* that the District would approve transfer of title, in recognition of all the work, investment, and value the Developers were bringing to the Land. *See* SAC ¶¶ 4; 48; 51; 83; 108; 114; 138; 139. *District Intown Properties* is therefore inapposite. Equally inapposite is NFPH's citation of *Batra v. Bd. of Regents of Univ. of Nebraska*, 79 F.3d 717, 720 (8th Cir. 1996). NFPH Mot. at 33. All *Batra* stands for is the proposition that a plaintiff must have more than "a mere subjective expectancy" interest. Here, again, the Developers' expectation was not subjective; rather, it was objectively rooted in established contracts, rights and returns, *plus* the District's repeated promises that it would approve transfer of title in due course. *See* SAC ¶¶ 4; 48; 51; 83.

The District contends, however, that even if this Court were to discern an injury regarding the foreclosure sale, it would still not pass Article III muster because this injury "is not one that affects Plaintiffs in a personal and individual way."  District Mot. at 15.  It is difficult to fathom an injury that affects a litigant more personally and directly than complete destruction of *that litigant's* land rights and annihilation of *that litigant's* substantial development investments. Furthermore, the District's attempt to re-characterize the Developers' allegations as a "sort of generalized grievance that would affect all members of the public equally" misapprehends what constitutes a "generalized grievance" and/or ignores the allegations in the Second Amended Complaint.  District Mot. at 15; *see also* NFPH Mot. at 15 n.7.  Cases like *Hollingsworth v. Perry*, relied upon by the District, that dismiss a claim for being a generalized grievance do so only when a plaintiff is "claiming [] harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large."  133 S. Ct. 2652, 2662 (2013).  Here, far from pressing a generalized grievance that seeks to redress injuries sustained to the public at large, the Developers have articulated an injury on behalf of "interested parties such as [UMC Development and Jacksophie]" "[a]s rightful owner of the [] Land holding contractual and other rights to it."  SAC ¶ 91.  The Developers are not roving, good-government ombudsmen who challenge sham foreclosure auctions wherever they arise.  Rather, the Developers had a particular and concrete interest in the Land.  Its sale at a charade of an auction particularly injured them because they held property interests in the Land, because they had devoted significant resources to its improvement, and because they had a pecuniary stake in a successful foreclosure auction. These facts categorically differentiate the Developers from the general public.

**B.     The Developers' Injuries Are Fairly Traceable To Defendants.**

The District also argues that the Developers' injuries are not traceable to the foreclosure because "the District never gave th[e] necessary approval" for transferring title of the land to the Developers.  District Mot. at 22.  But it was undeniably the foreclosure—not the failure to approve—that eliminated the Developers' rental income from the Land and expropriated their investments and development plans.  *See* SAC ¶¶ 108; 131.  That the Developers were not actively receiving rental income at the time of the foreclosure, as the District contends, does not change this calculus.  The Developers received rental income before the foreclosure (irrespective of the fact that the District had not granted its approval to transfer title), and they could have retained new rent-paying tenants regardless of the District's approval.  *See id.* ¶¶ 44–46.  The only thing that prevented the Developers from continuing to earn money from the Land was the District's foreclosure.

Furthermore, it was also the foreclosure that eliminated the Developers' property interest in the Land.  The District contends it is "speculative" that the District would ever approve the transfer of title, so the foreclosure merely took away a contingent future interest that never would have been realized.  District Mot. at 22.  That contention, however, ignores both the pleaded facts and the law.  The District *repeatedly promised* to approve transfer of title and the expectation that the District of Columbia would hold true to its promises should (to understate the point) rank better than mere speculation.  *See* SAC ¶¶ 4; 48; 51; 83; 108; 114; 138; 139.  What is more, municipalities have *a legal duty* to take reasonable steps to obtain approvals necessary to fulfill a promise to a developer.  *See Heritage Common Partners v. Summit*, 730 F. Supp. 821, 825 (N.D. Ill. 1990).  Given the District's promises and legal duty to approve the transfer, it is not "speculative" but eminently sound to assume—especially at the pleadings stage, where *all* inferences must be drawn for the Developers—that the District would have approved transfer of

the title were it not for the foreclosure.  Thus, it was the foreclosure that caused the Developers

to lose their property interest in the Land.[7]

Separately, NFPH claims that the Developers' injuries are traceable only to the settlement

agreements that CMC Realty and SHW-GSE signed with the Developers in 2014.  NFPH Mot. at

19.  But the Developers lost their investments, development plans, and property interest *in 2010*

as soon as the foreclosure happened.  As such, the settlement agreements in 2014 could not have

caused the injuries that form the basis for the Developers' claims against Defendants.

### C.   The Developers' Injuries Are Redressable By This Court.

Last, the District argues that the Developers' injuries are not redressable because the

District never approved the transfer of title and this Court would therefore have no authority to

order the District to do so.  *See* District Mot. at 21–23.  Yet it is obviously within this Court's

power to order transfer of title to the Developers.  *See Armenian Assembly of Am., Inc. v.

Cafesjian*, 772 F. Supp. 2d 129, 133 and 163 (D.D.C. 2011) (using equitable powers to order

party to transfer property in compliance with D.C. law); *Boggs v. Merletti*, 987 F. Supp. 1, 9

(D.D.C. 1997) (noting the court's equitable power to order the return of plaintiff's seized

property).  And, in any event, the Court could award the Developers damages for their losses.

*See, e.g.*, *Palazzolo v. Rhode Island*, 533 U.S. 606, 630 (2001) (finding compensable an

ownership interest for which title has not transferred); *Cheatham v. Carter County*, 363 F.2d 582,

585 (6th Cir. 1966) (finding compensable purchases in a binding executory contract for which

title had not transferred).  There is therefore no real question here about redressability.

---

[7]   Even if the foreclosure was only one cause among many of the loss of the Developers'
property interest, the Supreme Court has long held that when an injury in fact has multiple
independent causes, a plaintiff has standing to challenge any one of those causes by itself,
provided that a judicial decision is likely to redress that one cause.  *See, e.g.*, *Bryant v. Yellen*,
447 U.S. 352, 367 (1980).

Even as to transfer of title, redressability is clear from the Second Amended Complaint. The Developers alleged that the "District repeatedly and expressly assured the Developers that title to the Development Land would be rightfully transferred to them as the actual owners." SAC at ¶ 139. The District had not yet approved the transfer at the time of the foreclosure, but it still could have fulfilled its promises and approved the transfer at a future date (assuming it did not foreclose on the Land). It is surely reasonable to assume that the government will keep its word. Indeed, municipalities have a duty to take reasonable steps to obtain the contingent approval necessary to fulfill a contract with a developer, *Heritage Common Partners*, 730 F. Supp. at 825. Here, given that the government "repeatedly and expressly" promised to approve the transfer of title, the only reasonable inference is that it would eventually do so. Once the Developers' factual allegations are duly credited, the only barrier to the Developers' acquisition of title was the District's foreclosure. The District should therefore be ordered to follow through now and not violate the commitments it made.

In questioning redressability, NFPH cites *Miami Building & Construction Trades Council v. Secretary of Defense*, which holds that a plaintiff lacks standing to challenge a defendant's failure to convey land to third-party "independent actors not before the courts" when those third parties are free to make "unfettered choices" concerning how they dispose of the land. 493 F.3d 201, 205 (D.C. Cir. 2007). *Miami Building* is inapt because the District *is* before this Court, and its choices are not "unfettered." Far from seeking judicial intrusion into a sphere where local government retains complete discretion, the Developers merely ask this Court to hold the District to its legal obligations and to follow through on binding commitments.

NFPH also asserts that judicial redress is impossible because CMC Realty is not a party to this lawsuit and therefore cannot be ordered to convey the Land to the Developers. NFPH

Mot. at 19–20.  Of course, title to the Land is now held by NFPH (*see* SAC ¶¶ 109; 141–42),

which *is* a party before the Court and can be ordered to transfer title to the Developers directly.

## III.     THE MISCELLANEOUS LEGAL DOCTRINES INVOKED BY THE DEFENDANTS DO NOT BLOCK THE DEVELOPERS' CLAIMS

### A.     Sovereign Immunity Does Not Apply

The District argues that sovereign immunity requires dismissal of several of the

Developers' claims.  *See* District Mot. at 23–28.  The District's foreclosure, however, was not a

discretionary action shielded by sovereign immunity.  The law has long held that intentional

invasions of property by the government, such as the foreclosure at issue here, are not

"discretionary" actions immune from suit.  *See Hatahley v. United State*s, 351 U.S. 173, 179–81

(1956) (wrongful trespass is not "discretionary" action under the Federal Tort Claims Act);

*Payton v. United States*, 636 F.2d 132, 146 (5th Cir. 1981) (following *Hatahley*); *cf. District of*

*Columbia v. North Washington Neighbors*, 367 A.2d 143, 148 n.7 (D.C. 1976) (explaining that

the Federal Tort Claims Act informs D.C.'s sovereign- immunity jurisprudence).  Here, it is clear

from the Second Amended Complaint that the District knew its foreclosure was wrongful and

would invade the Developers' property interests.  *See* SAC ¶¶ 2–4; 14; 78; 87; 98.

Nor can discretionary function immunity possibly shield Defendants from liability for

*uncompensated takings or other constitutional violations*, as NFPH erroneously contends.  *See*

NFPH Mot. at 23–25.  Obviously, "a municipality has no 'discretion' to violate the Federal

Constitution; its dictates are absolute and imperative."  *Owen v. City of Independence, Missouri*,

445 U.S. 622, 649 (1980).  The District presumably knows as much, which is why it—the actual

holder of the supposed immunity—does not join NFPH on this point.

Furthermore, the District's repeated promises to approve the transfer of title foreclose any

contention that its approval was a "discretionary" action immune from suit, as the District

contends.  *See* SAC ¶¶ 4; 48; 51; 83; 108; 114; 138; 139.  In *CASCO Marina Development,*

*L.L.C. v. D.C. Redevelopment Land Agency*, the D.C. Court of Appeals held that the refusal by a

D.C. agency to approve the terms of a lease it had promised to approve is not a "discretionary"

action shielded by sovereign immunity.  834 A.2d 77, 82–83 (D.C. 2003).  Just so here.  There

was a "mutual understanding and agreement between the District and the Developers that the

Developers would develop the [] Land."  SAC ¶ 133.  As part of this "mutual understanding and

agreement," the District repeatedly and expressly promised to approve transfer of title of the

Land to the Developers.  *See id.* ¶¶ 4; 48; 53; 83; 108; 114; 138–39.  The District's "choice"

about whether to stick to its promises, used to induce valuable services performed in good faith,

is not "discretionary" as that term is used in the sovereign-immunity context.  A contrary holding

that the District has "discretion" to break its word and its contracts and be shielded by sovereign

immunity would wreak havoc with settled expectations and the need for the District and other

governmental entities to have regular, reliable business dealings with private parties protected by

the rule of law.  Thus, immunity is no bar to this suit.

### B.  The *Rooker-Feldman* Doctrine Does Not Apply

The District has also moved to dismiss based on the *Rooker-Feldman* doctrine.  Under

this doctrine, a federal district court cannot "exercis[e] jurisdiction over cases brought by state-

court losers challenging 'state-court judgments rendered before the district court proceedings

commenced." *Exxon Mobil v. Saudi Basic Indus.*, 544 U.S. 280, 284 (2005).  Federal courts,

however, are careful to apply the rule "only in limited circumstances." *Lance v. Dennis*, 546

U.S. 459, 463 (2006).  This case falls well outside those limited circumstances.

Specifically, the *Rooker-Feldman* doctrine bars a federal court from exercising

jurisdiction only over claims challenging a *final judgment on the merits* issued by a state court.

Here, the Developers are not contesting the D.C. state court decision, and, in any event, D.C.

state courts dismissed the Developers' state claims *without prejudice*, so there was no final

judgment for purposes of *Rooker-Feldman*.  *See, e.g.*, *Merrill Lynch Bus. Fin. Servs., Inc. v.*

*Nudell*, 363 F.3d 1072, 1076 (10th Cir. 2004) ("Because the state court, by dismissing without

prejudice, did not reach the merits of Merrill Lynch's claim, neither the actually decided nor the

inextricably intertwined tests are satisfied.  Hence, the *Rooker-Feldman* doctrine does not

apply"); *Whiteford v. Ree*d, 155 F.3d 671, 674 (3d. Cir. 1998) ("This court has consistently held

that where a state action does not reach the merits of a plaintiff's claims, then *Rooker-Feldman*

does not deprive the federal court of jurisdiction."); Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 4469.1, at 130–31 (2d ed. 2002) ("A decision not on the merits

also does not oust federal jurisdiction to decide on the merits.").  The *Rooker-Feldman* doctrine

is thus wholly inapplicable here.[8]

Furthermore, the *Rooker-Feldman* doctrine does not apply for the additional reason that

this federal action was filed years before the D.C. Superior Court issued its order dismissing the

Developers' state law claims without prejudice.  *See Nicholson v. Shafe*, 558 F.3d 1266, 1274

(11th Cir. 2009) (*Rooker-Feldman* does not apply when appellants "commenced the federal

district court action before the end of state proceedings").  Accordingly, the *Rooker-Feldman*

doctrine could not possibly bar the Developers' claims.

### C.    Collateral Estoppel Does Not Apply

NFPH (but not the District) contends that the Developers are barred by collateral estoppel

from arguing issues relating to standing that were decided by the D.C. courts.  *See* NFPH Mot. at

9–13.  This Court applies D.C. law to determine the preclusive effect of a D.C. state court's

---

[8]  It bears noting that a Takings Clause claim by definition requires the exhaustion of state-law claims, so there must necessarily be an adverse state-court decision before a federal Takings Clause claim can be brought.  *See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–95 (1985).  If such claims were barred by the *Rooker-Feldman* doctrine then Takings Clause claims could *never* be brought in federal court.

ruling.  *See Morgan v. Barry*, 785 F. Supp. 187, 192 (D.D.C. 1992).  Under D.C. law, the doctrine

of collateral estoppel, also known as issue preclusion,

> renders conclusive in the same or a subsequent action
> determination of an issue of fact or law when (1) the issue is
> actually litigated and (2) determined by a valid, final judgment on
> the merits; (3) after a full and fair opportunity for litigation by the
> parties or their privies; (4) under circumstances where the
> determination was essential to the judgment, and not merely
> dictum.

*Davis v. Davis*, 663 A.2d 499, 501 (D.C. 1995) (citation omitted).

Collateral estoppel does not apply here because the standing question at issue in this case

was not "actually litigated" in the D.C. courts.  The D.C. courts decided only whether standing

was adequately pleaded in the *original complaint* before them.  They did not decide whether the

*Second Amended Complaint* at issue here—which includes allegations not present in the original

complaint—pleaded standing.  Relying on case law from the Seventh Circuit, NFPH contends

that the Court should not consider these clarifying allegations in the Second Amended

Complaint.  NFPH Mot. at 11–12 (citing *Perry v. Sheehan*, 222 F.3d 309 (7th Cir. 2000)).  But

the law of *this Court* is firmly against NFPH.  Specifically, in *Ponder v. Chase Home Fin., LLC*,

865 F. Supp. 2d 13 (D.D.C. 2012), this Court found that a prior jurisdictional ruling had no

preclusive effect because it was entered without prejudice, and this Court then went on to

consider "added factual allegations" in a revised complaint that "expand[ed] upon" allegations in

an earlier complaint.  *Id*. at 18; *see also, e.g.*, *GAF Corp. v. United States*, 818 F.2d 901, 913 &

n.76 (D.C. Cir. 1987) ("The preclusive effect of the first jurisdictional judgment is limited to

matters actually raised and necessarily decided; it does not extend to matters that could have

been raised."); *Waltz v. U.S. Department of Agriculture*, 251 F.R.D. 491, 499 (E.D. Cal. 2008)

(noting that an earlier dismissal on jurisdictional grounds "does not necessarily preclude seeking

jurisdiction based on different and unlitigated jurisdictional facts"). Accordingly, collateral

estoppel is inapplicable, as the issue of whether the Second Amended Complaint pleads standing

has never before been litigated.

The second element of the collateral estoppel test —namely, the presence of "a valid,

final judgment on the merits"—also is not satisfied here. *See In re Wilde*, 68 A.3d 749, 759

(D.C. 2013) (noting that "a valid, final judgment on the merits" is necessary for issue preclusion

under D.C. law); *Washington v. United States*, 366 A.2d 457, 459–60 (D.C. 1976) (dismissal of

indictment for failure to charge an offense is not a decision on the merits and therefore does not

trigger issue or claim preclusion). The D.C. Superior Court dismissed the Developers' state-law

claims "without prejudice." It is "beyond dispute that a dismissal without prejudice does not

determine the merits." *Interdonato v. Interdonato*, 521 A.2d 1124, 1131 n.11 (D.C. 1987);

*accord Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1210 (D.C. 2002); *McAlister v. Potter*,

843 F. Supp. 2d 117, 121 (D.D.C. 2012). Because there has been no final judgment on the

merits, collateral estoppel does not preclude the Developers from arguing standing in this

proceeding. *See Ponder*, 865 F. Supp. 2d at 16–18 (holding that the plaintiff's claims were not

barred by issue preclusion because the prior action had been dismissed without prejudice). Lest

there be any doubt, the D.C. Court of Appeals itself *expressly left open* the prospect that the

Developers would proceed in this fashion, with a "new complaint" that might "be meritorious if

the defect in standing were cured." *UMC Dev., LLC*, 2015 WL 4113371, *8

For its arguments, NFPH relies extensively on *Dozier v. Ford Motor Co.*, 702 F.2d 1189

(D.C. Cir. 1983), but that case is inapposite. *Dozier* considers the preclusive effect of a

jurisdictional ruling by a federal court, not a state court. This Court is instead being asked to

consider the effect of a state jurisdictional ruling, and it is well-established that state law

determines the preclusive effect of state-court judgments.  *See Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380–86 (1985).  As discussed, D.C. state law says that dismissals without prejudice have no preclusive effect.  *See Interdonato*, 521 A.2d at 1131.  Plus, the D.C. Court of Appeals went out of its way in this case to prevent its decision from having a preclusive effect on future litigation.  As such, cases like *Dozier* (and every other case cited by NFPH) considering the preclusive effect of *federal* jurisdictional rulings are not controlling.

In any event, *Dozier* actually supports the Developers' position.  Ultimately, in *Dozier*, the federal-court ruling did not have preclusive effect in state court.  As the D.C. Circuit stated: "The issue litigated here, as we have discussed, was whether the present claim exceeded the jurisdictional minimum.  Dismissal 'without prejudice' was appropriate, of course, to make it clear that appellant *was not to be precluded by the doctrine of res judicata from having his claim heard on the merits in state court*."  *Dozier*, 702 F.2d at 1194 (emphasis added).  Just as in *Dozier*, the Developers should not be precluded from having the merits of their claims heard.

### D.     D.C. Code § 12-309 Does Not Apply

Section 12-309 of the D.C. Code generally requires that a party suing the District for "unliquidated damages," provide the District with "notice in writing" "within six months after the injury."  The District contends the Developers failed to comply with this provision and that, as a result, their non-federal claims seeking unliquidated damages are barred (*i.e.*, Counts III (Wrongful Foreclosure), Count V (Tortious Interference), Count VI (Breach of Contract), Count VII (Unjust Enrichment), and Count IX (Quantum Meruit)).  Section 12-309, however, does not apply to Counts III, Count VII, and Count IX because these claims do not seek unliquidated damages as a primary form of relief.  In any event, the District was on notice of the Developers' injuries relating to these counts and as to Counts V and VI, which under established case law obviates any need for the Developers to provide separate written notice to the District.

31

### 1.    Counts III, VII, & IX Do Not Seek Unliquidated Damages.

By its terms, § 12-309 applies only to claims for "unliquidated damages to person or property."  "Money damages are, of course, the classic form of legal relief."  *Mertens v. Hewitt Associates*, 508 U.S. 248, 255 (1993) (emphasis in *Mertens*).  They "provide a victim with monetary compensation for an injury to his person, property, or reputation."  *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  As the D.C. Court of Appeals has indicated, the requirement in § 12-309 that the damages be "to person or property" signals that § 12-309 applies to claims for "money damages" of the sort discussed in *Bowen*.  *See District of Columbia v. Campbell*, 580 A.2d 1295, 1301–02 (D.C. 1990).

The scope of § 12-309 is thus limited to claims for money damages; the provision does not cover claims that pursue other sorts of relief, such as equitable relief.  There is a clear "distinction between an action at law for damages . . . and an equitable action for specific relief."  *Bowen*, 487 U.S. at 893 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949)).  This distinction holds even when the equitable relief directs one party to remit funds to another:  "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  *Id.*  For example, "restitution"—which is traditionally an "equitable remedy," is traditionally "an equitable remedy."  *Chase Manhattan Bank v. Burden*, 489 A.2d 494, 497 (D.C. 1985)—requires the payment of money, but it is a different remedy than damages.  *See* Dan B. Dobbs, Law of Remedies § 4.1(1), at 557 (2d ed. 1993) ("Restitution is not damages.").  The difference is that restitution aims not to compensate injuries (like money damages do) but instead to "restor[e] the status quo" and "order[] the return of that which rightfully belongs to the [victim]."  *Porter v. Warner Holding Co.,* 328 U.S. 395, 402 (1946).  Accordingly, unlike damages, restitution is "typically measured by reference to the defendant's gain rather than the plaintiff's loss."  *Peart v.*

*D.C. Housing Authority*, 972 A.2d 810, 820 (D.C. 2009).  In short, claims that pursue restitution,

equitable relief, or other non-damages remedies are altogether exempt from § 12-309 because

they are not claims for "damages to person or property."  *E.g.*, *Ibrahim v. University of the*

*District of Columbia*, 742 A.2d 879, 881 (D.C. 1999) (§ 12-309 inapplicable to claim seeking

specific performance); *Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 157 (D.D.C. 2013)

(§ 12-309 inapplicable to claim for equitable relief); *Mpoy v. Fenty*, 870 F. Supp. 2d 173, 181

(D.D.C. 2012); *Lindsey v. District of Columbia*, 810 F. Supp. 2d 189, 202 (D.D.C. 2011) (same);

*Blocker-Burnette v. District of Columbia*, 730 F. Supp. 2d 200, 204–05 (D.D.C. 2010) (same);

*Byrd v. District of Columbia*, 538 F. Supp. 2d 170, 176 (D.D.C. 2008) (same).

The Developers' claims in Counts III, VII, and IX seek equitable remedies, not damages:

- Count III primarily seeks rescission for the foreclosure. SAC ¶¶ 6; 150.  "Rescission is an equitable remedy."  *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001).[9]

- Count VII seeks restitution for unjust enrichment.  SAC ¶ 137. "Restitution," as noted, is an "equitable remedy."  *Chase Manhattan Bank*, 489 A.2d at 497.[10]

- Count IX seeks quantum meruit.  "Quantum meruit is an equitable remedy."  *Prince Construction Co. v. D.C. Contract Appeals Board*, 892 A.2d 380, 382 n.1 (D.C. 2006).

---

[9]   The District's citation to *Johnson v. Fairfax Village Condominium IV Unit Owners Assoc.*, 641 A.2d 495, 504-05 (D.C. 1994) for the proposition that "a claim for wrongful foreclosure sounds in tort" is unavailing.  District Mot. at 34.  Whatever might be said of wrongful-foreclosure actions in other cases, the relief the Developers seek here stands simply to undo the foreclosure and restore the Developers' preexisting rights.  Because the Developers have the option to seek "alternative and inconsistent remedies," *Nat'l Life Ins. Co. v. Silverman*, 454 F.2d 899, 905 (D.C. Cir. 1971), and are here seeking equitable relief, § 12-309 cannot defeat the pending claim.

[10]   Even if Count VII does seek damages, it does not seek "unliquidated damages," and § 12-309 applies only to claims for unliquidated damages.  "A debt is liquidated if, at the time it arose, it was an easily ascertainable sum certain."  *Washington Gas Light Co. v. Public Service Commission of the District of Columbia*, 61 A.3d 662, 676 (D.C. 2013) (citation omitted).  In other words, damages are liquidated if they are "capable of ascertainment by computation."  *District of Columbia v. World Fire & Marine Insurance Co.*, 68 A.2d 222, 225 (D.C. 1949).  Count VII seeks restitution of the "fixed amount" the Developers invested in the Land and that has unjustly enriched the District and NFPH.  SAC ¶ 153.  How much the Developers spent on their investments is readily "capable of ascertainment by computation" by tallying the Developers' receipts of their development expenditures.

Thus, under *Ibrahim* and the cases cited above, § 12-309 is inapplicable to these claims.

## 2. The District Had Adequate Notice Under § 12-309.

Even if § 12-309 applies to *some* of the Developers' claims (such as the damages aspect of Count III, or to Counts V and VI, which seek unliquidated damages), the District had sufficient notice under § 12-309 to render strict compliance with the notice requirement inapplicable. In general, § 12-309 requires that formal notice be given. *See Doe by Fein v. District of Columbia*, 697 A.2d 23, 29 (D.C. 1997). But the D.C. courts have "carved out" a "narrow exception to the strict requirements of Section 12-309" for claims as to which "the District of Columbia had actual knowledge of the breach and the injuries arising from [the breach]." *Williams v. District of Columbia*, 916 F. Supp. 1, 6 n.5 (D.D.C. 1996).

In *Shehyn v. District of Columbia*, the D.C. Court of Appeals held that when the District "itself" (as opposed to its employees) is "in breach of a duty," is "aware of the breach," and is "aware of the injury produced by the breach," then no further notice is required under § 12-309. 392 A.2d 1008, 1014 (D.C. 1978). Twelve years later, in *District of Columbia v. Campbell*, the D.C. Court of Appeals reaffirmed that the *Shehyn* doctrine renders compliance with § 12-309 "unnecessary" when the District "is itself in breach of a duty" and "is aware both of the breach and of the injury." 580 A.2d at 1299; *see also Chidel v. Hubbard*, 840 A.2d 689, 695–96 (D.C. 2004) (acknowledging the *Shehyn* doctrine, but finding it inapplicable where the claimed negligence was by the District's employees rather than by the District itself).

This case falls squarely within *Shehyn*. The Developers allege that the District "was well aware" and "knew" the foreclosure was wrongful. SAC ¶ 81; *see also id.* ¶¶ 35; 108; 121; 147. It is of no moment that the District did not know precisely "how much" the Developers had invested in the Land (and lost as a result of the foreclosure). *Shehyn* requires only that the

District know that its breach resulted in a particular injury, not that the District know the exact dollars and cents of that injury.  392 A.2d at 1014.

Indeed, § 12-309 expressly states that notice is sufficient if it communicates "the approximate time, place, cause, and circumstances of the alleged injury or damage."  There is no requirement that the District be notified of the *size* of the injury.  Nor would there be reason to require such calculation for purposes of this notice statute.  Because § 12-309 by its terms applies only to claims for unliquidated damages—*i.e.*, claims for which the damages cannot be readily ascertained—it would be perverse to require potential plaintiffs to tell the District at the outset the difficult-to-ascertain size of their injuries.  What matters is that the District be on notice of the basic injury, at which point it can investigate the precise dimensions for itself.  *Barnhardt v. District of Colombia*, 8 A.3d 1206, 1210 (D.C. 2010).  Thus, D.C. courts have often held that notice under § 12-309 need not include precise figures, even as to the time of the injury and other items that § 12-309 expressly mentions; all that is required is that the District know enough to conduct a focused investigation. *See, e.g.*, *Washington v. District of Columbia*, 429 A.2d 1362, 1365–66 (D.C. 1981) (en banc); *Wharton v. District of Columbia*, 666 A.2d 1227, 1231 (D.C. 1995).  Here, as set forth in the Second Amended Complaint, the District knew at the outset the time, place, cause, and circumstances of its wrongful foreclosure on the Land, just as it knew that the Developers' development rights and interests would suffer.  *See* SAC ¶¶ 47; 51.  It thus had sufficient information to enable investigation, and to satisfy § 12-309 and *Shehyn*.[11]

---

[11]   NFPH contends separately that the Developers' claims are barred under D.C. Code § 44-951.15, a notice provision similar to § 12-309, that requires notice of claims for unliquidated damages against NFPH to be provided to the Hospital's CEO no later than six months from the date of injury.  This notice provision, however, was not enacted until September 14, 2011—more than one year after NFPH became the owner of the Hospital on July 12, 2010. The Developers therefore had no obligation to comply with § 44-951.15, as it did not even exist until over a year after the Developers' suffered their injuries.

### E.       The Developers' Claims Are Timely

Given that this suit was undisputedly filed before any statute of limitations ran, that all claims arise out of the same set of facts, and that Defendants have always been and remain alert to all of the factual and legal contentions at issue, timeliness should be beyond question.

### 1.       The Developers' Federal Claims Are Timely.

It is impossible to understand how the Developers' federal claims might be time barred as a result of their October 8, 2013, dismissal without prejudice.  *See* District Mot. at 29–31; *see also* NFPH Mot. at 37–39.  The takings claim accrues for statute-of-limitations purposes when it ripens—which is only *after* exhaustion of state-court remedies.  *See, e.g.*, *Biddison v. City of Chicago*, 921 F.2d 724, 729 (7th Cir. 1991) ("the statute of limitations will begin to run [on plaintiff's takings claim], if and when [plaintiff] is denied just compensation by the state courts"); *Corn v. City of Lauderdale Lakes*, 904 F.2d 585, 588 (11th Cir. 1990) (plaintiff's taking action accrued at the issuance of the state appellate court's decision invalidating the zoning ordinance in question).  As discussed more fully below in Section III.F, the Developers' takings claim fully ripened on August 13, 2015, when the D.C. Superior Court dismissed the Developers' state-law claims without prejudice and effectively denied them just compensation.  *See Williamson County Regional Planning Comm'n*, 473 U.S. at 194–95.  There can therefore be no dispute that the takings claim in the Second Amended Complaint is timely.

As for the due-process claim, it accrued on July 9, 2010, the date of the foreclosure. Defendants do not dispute that the Developers' federal claims were within the three-year limitations period when they were timely filed in the Developers' original complaint in D.C. Superior Court on May 31, 2013.  *See* D.C. Code § 12–301(8).  Defendants also do not dispute that the federal claims were still timely when the District removed the federal claims to this Court.  Instead, Defendants contend that these claims became irretrievably time-barred on

36

October 8, 2013, when this Court remanded the Developers' state-law claims and simultaneously dismissed the federal claims without prejudice.  District Mot. at 29; *see also* NFPH Mot. at 37.

Defendants are incorrect.  Just days after the entry of the dismissal order, the Developers filed a motion asking the Court to clarify the effect of its order, noting the potential statute-of-limitations issues that might arise if those claims were dismissed, even without prejudice.  *See* ECF 29.  The Court granted the Developers' motion and stated, in no uncertain terms, that it had "prospectively toll[ed] the statute of limitations on those claims," thereby confirming that the Developers' federal claims would not be time-barred if raised in the future.  ECF 32.  Thus, the Developers' federal due-process claim is also timely.

Defendants nevertheless press on, quoting *Ciralsky v. C.I.A.*, 355 F.3d 661 (D.C. Cir. 2004) for the proposition that the "severance and dismissal of Plaintiffs' federal claims resulted in these claims being time-barred, even though they were dismissed without prejudice and without a ruling on the merits."  District Mot. at 29; *see also* NFPH Mot. at 38–39.  In doing so, Defendants not only ignore the clear and explicit order from this Court tolling the statute of limitations for the Developers' federal claims, but also defy the numerous decisions by the D.C. Circuit and other circuit courts recognizing that claims dismissed without prejudice after the statute of limitations has run may be preserved, provided that the plaintiff timely and proactively alerts the court to the issue. *See, e.g.*, *Ciralsky*, 355 F.3d at 673–74 (following a dismissal without prejudice, plaintiff may preserve the limitations period that has otherwise run by "advis[ing] the court in a timely fashion"); *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir.

1993); *Garcia Morales v. Instituto Comercial de Puerto Rico Junior Coll.*, 215 F.3d 1311 (1st

Cir. 2000).[12]

### 2.      The Developers' State Law Claims Are Timely.

The Developers' state-law claims are all timely under the "relation back" doctrine.  *See*

Fed.R.Civ.P. 15(c).  "Federal Rule of Civil Procedure 15(c) permits amendments to a complaint

that relate back to a timely-filed claim only if the amendment grows out of the same set of facts

and the timely-filed complaint contained facts sufficient to give defendant adequate notice of the

claim presented in the amendment."  *Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp.

2d 59, 67 (D.D.C. 2008).  "The rationale underlying this rule is that a party who has been

notified of litigation concerning a particular occurrence has been given all the notice that statutes

of limitations were intended to provide."  *Philogene v. District of Columbia*, 864 F. Supp. 2d

127, 133 (D.D.C. 2012).  Here, the Court need not look any further than the first sentence of the

District's motion to dismiss to understand that the Developers' state-law claims grow out of the

same set of facts as the Developers' federal claims.  There, the District agrees that "[*a*]*ll* of

Plaintiffs' claims arise from the District's lawful efforts between October 2007 and July 2010 to

maintain the viability of a hospital serving some of the District's neediest residents."  District

Mot. at 1 (emphasis added); *see also* ECF 7 at 6 (District's Opposition to Plaintiffs' Motion to

Remand) ("All of Plaintiffs' claims clearly stem from the same common nucleus of operative

fact—the District's foreclosure upon the only hospital within the District of Columbia operating

---

    [12]   Indeed, the very case upon which Defendants rely (*Ciralsky*) contradicts their
position.  In that case, the D.C. Circuit remanded "the case to the same district judge to allow
him to decide whether, given the surfacing of the statute of limitations problem, he wishes to
give plaintiff a further chance by allowing the present action to proceed, based on Ciralsky's 28–
page proposed second amended complaint."  *Ciralsky*, 355 F.3d at 673–74 (internal quotations
and citations omitted).  Consistent with that instruction, Judge Roberts then reinstated Ciralsky's
claims.  *Ciralsky*, No. 00–1709, Dkt. 36 (D.D.C. Apr. 1, 2004).

east of the Anacostia River and the resulting effect on Plaintiffs' alleged rights under its

agreement with a private entity to develop land surrounding this Hospital."). By the District's

own acknowledgement, therefore, the Developers' state-law claims grow out of the federal

claims; they are therefore timely under Federal Rule of Civil Procedure 15(c).[13]

Separately, the District contends that the Developers' quantum meruit and restitution

claims are untimely because they accrued even before the foreclosure on July 9, 2010. *See*

District Mot. at 31–32. The District is correct that the statute of limitations for these claims

"'starts to run upon the occurrence of the wrongful act giving rise to a duty of restitution.'" *Id.* at

31 (citing *News World Communications, Inc., v. Thompsen*, 878 A.2d 1218, 1223 (D.C. 2005)).

The District is incorrect, however, when it claims that this "happens when the plaintiff has

completed its services to the defendant and the defendant has refused to provide compensation

for those services." *Id.* at 32. Instead, "[a] claim for unjust enrichment only accrues . . . when

the enrichment becomes unjust." *News World*, 878 A.2d at 1223. Here, the enrichment became

unjust on July 9, 2010, when the District purported to foreclose on the Hospital and the Land and

then transferred ownership of the Hospital and the Land to NFPH on July 12, 2010—thereby

claiming for itself the benefit of the predevelopment activities the Developers undertook at the

District's behest. The Developers' quantum meruit and unjust enrichment claims are therefore

timely because they were filed on May 31, 2013, which was well within the applicable three year

statute of limitations.

---

[13]   Defendants completely ignore Rule 15(c)'s relation-back doctrine and argue instead that the Developers' state-law claims are untimely because of the D.C. Superior Court's dismissal. District Mot. at 71; NFPH Mot. at 38. Defendants, however, cite no support for that assertion. Nor have they provided any rationale for the Court to depart from the well-established relation-back doctrine that controls under the circumstances presented here.

**F.     The Developers' Federal Claims Are Ripe.**

NFPH contends that the Developers' federal claims are unripe because the Developers

supposedly failed to exhaust their state-court remedies.  NFPH Mot. at 27.  That is incorrect.  For

a takings claim to ripen in federal court, the plaintiff must have exhausted state-court remedies

that might supply just compensation.  *See Williamson County*, 473 U.S. at 194–95.  With the

D.C. Court of Appeals' affirmance of the dismissal of the Developers' state-law claims, and the

D.C. Superior Court amending its order to reflect that mandate, the Developers have, in fact,

exhausted their state-court remedies.

Without citing any case law in support, NFPH nevertheless contends that the Developers'

takings claim is not properly exhausted because the D.C. Superior Court's dismissal was "only []

a jurisdictional dismissal . . . ."  NFPH Mot. at 27.  *Williamson County*, however, does not

require a merits-based dismissal for a takings claim to ripen in federal court.  Rather, under

*Williamson County*, all that is required is a state court order that "conclusively determine[s]

whether [plaintiff] will be denied all reasonable beneficial use of its property. . . ."  473 U.S. at

194.  If, as Defendants contend, the D.C. Superior Court's dismissal operates to forever bar the

Developers from returning to D.C. state court to complain of the District's foreclosure, then it is

of no moment that the dismissal was jurisdictional in nature.  The dismissal had the effect of

"conclusively determin[ing]" that the Developers would have no beneficial use of the Land.  The

Developers' takings claim is therefore ripe and primed for resolution.

NFPH also argues that the Developers have not exhausted their takings claim because

they "never alleged or otherwise asserted a claim for inverse condemnation of the [] Land."

NFPH Mot. at 27.  This statement is demonstrably false.  The Developers *did* allege a Fifth

Amendment takings claim when it first filed its lawsuit in D.C. Superior Court.  *See* ECF 1-1

¶¶ 124–29.  In fact, the Developers would have litigated their takings claim in D.C. Superior

Court *but for NFPH's and the District's removal of the action to this Court*.  *See* ECF 24 ¶ 2

(NFPH's Notice of Joinder in Removal Petition) (requesting removal to federal court because the

Developers' lawsuit included a due process *and a takings claim*).  Indeed, at that time, NFPH

argued that this Court *was required to exercise federal jurisdiction over the Developers' takings

claim*—which is exactly what the Court did.  *See* ECF 20 at 8.  NFPH cannot seriously now

contend that the Developers have failed to exhaust their takings claim when NFPH itself fought

to keep the Developers from litigating this claim in state court.

      NFPH also argues that the Developers' due-process claim is similarly unripe.  NFPH

Mot. at 28 n.15.  For the same reasons the Developers' takings claim is ripe, however, so too is

their due-process claim.  It nevertheless bears noting that the cases NFPH cites regarding the

applicability of the ripeness doctrine to due-process claims apply only in situations where the

due-process claim is "coextensive" with the takings claim.  *See id.*  Here, the Developers' takings

claim and due process claim are not coextensive.  The Developers' due-process claim challenges,

among other things, the absence of proper notice and process surrounding the government-

orchestrated foreclosure as well as the rigged foreclosure auction itself and rigged procedures

surrounding it.  *See* SAC ¶¶ 85-93.  The takings claim, on the other hand, challenges the

Defendants' complete dispossession of the Developers relative to the Land.  *See id.* ¶¶ 94–100.

Both constitutional claims are now clearly ripe.

## IV.    THE DEVELOPERS STATE CLAIMS FOR WHICH RELIEF CAN BE GRANTED

### A.    The Developers Have Alleged Wrongdoing By NFPH.

      NFPH erroneously contends that the Developers' claims against it must all be dismissed

because the Developers have "fail[ed] to allege any wrongdoing by NFPH[]."  NFPH Mot. at 31.

Not so.  Even a cursory review of the Second Amended Complaint demonstrates that the

Developers have alleged that by accepting and retaining ownership of the Hospital and the Land, NFPH was and remains complicit with the District in its wrongful foreclosure and unlawful seizure of the Land.  SAC ¶ 142 ("The District *and NFPH* acquired the [] Land unlawfully by conducting a fraudulent and procedurally invalid foreclosure auction, while knowing that *their actions* would deprive the Developers of their interest as the rightful owners of the [] Land.") (emphases added).  The Developers have further alleged that "[o]ccupation by NFPH of the Hospital and the [] Land denies the Developers their rightful property interests therein," *id.* ¶ 109, and that "[e]ach day NFPH claims ownership and possession of the Hospital and the [] Land—which it came to claim as a result of (and in complicity with) the District's wrongful foreclosure—deprives the Developers of unique and valuable property interests." *Id.*  Thus, far from failing to allege any wrongdoing by NFPH, the Developers have specifically alleged NFPH's role in the wrongdoing—a role that continues to this very day as NFPH persists in its unfounded claim to the Land.  It is therefore irrelevant that NFPH "was not the foreclosing entity."  NFPH Mot. at 31.  NFPH was and remains complicit in the illegal conduct alleged.

### B.      The Developers State A Due Process Claim.

"[T]he interpretation and application of the Due Process Clause are intensely practical matters and [] the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Goss v. Lopez*, 419 U.S. 565, 578, (1975) (citations and internal quotations omitted).  The District argues that the Second Amended Complaint fails to identify a constitutionally protected property interest, and that even if it does articulate such a property interest, it fails to state a claim for deprivation of that interest.  District Mot. at 34–41. The very cases cited by the District, however, reveal that the Developers pleaded a property interest consistent with the law of this Circuit.  *See George Washington Univ. v. District of Columbia*, 318 F.3d 203, 207–09 (D.C. Cir. 2003) (hereinafter referenced as "*GWU*").

Moreover, the District cites no case suggesting that dismissal for failure to state a claim is appropriate on the facts alleged here. Because the Developers plead a deliberate and grossly unfair deprivation of a property right without requisite notice, process, and hearing, the District's motion to dismiss Count I should be denied.

### 1.      The Developers State A Procedural Due Process Claim

The District advances two flawed arguments as to why the Developers' procedural due process claim fails. First, it repeats its recurring refrain that the Developers did not have "a property interest in the [] Land sufficient to trigger a due process requirement . . . ." District Mot. at 35. As discussed at great length above in Sections II.A.1-3, the Developers did have a sufficient interest in the Land. Prior to the foreclosure, the Developers had secured the right to earn development fees, rental payments, and other profits from developing the Land. *See* SAC ¶¶ 43–46. These rights inured to the Developers' benefit irrespective of whether they held title to the Land, as evidenced by the fact that the Developers received no less than $63,431.52 in rental income from a commercial tenant in 2009. *Id.* ¶ 44. Thus, far from "a future conditional interest in the [] Land that never vested" (District Mot. at 36), the Developers had a real and tangible property interest in the Land that had already started to pay dividends and would have continued to pay dividends but for the District's wrongful foreclosure. *See Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 476–77 (1973) (improvements to land made by a tenant are property interest whose deprivation is subject to Fifth Amendment challenge).

Beyond the Developers' interest in maintaining their development rights and rental payments, the Developers also had an expectation interest in the Land. As cases relied upon by the District make clear, a protected property interest can arise from the District withholding an expected benefit, even if the government enjoyed discretion to withhold the benefit. *See GWU*, 318 F. 3d at 207–09. The critical issue is the degree of discretion enjoyed by the District—the

43

more limited the District's discretion to deny the benefit, the more likely a court is to find a property interest. *Id.* Here the District's discretion to withhold its approval of transfer of title of the Land was sufficiently limited to give rise to the Developers' property interest.

Indeed, the District's authority was confined to its role as a limited partner in GSI. SAC ¶ 23. In that capacity, the District's discretion was anything but unlimited, as Exhibit 1.3 to the governing operating agreement prohibited the District from unreasonably withholding its approval, (*see* ECF 72-2 at 22), as did its duty of good faith and fair dealing in connection with these agreements. *See Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 42 F.3d 1398 (9th Cir. 1994) (unpublished); *Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 579 (D.N.J. 2010). The Second Amended Complaint makes clear that the District repeatedly promised and assured the Developers that transfer of title would occur as a matter of course. Once the Developers proceeded in reliance thereon, the District had no reasonable basis to withhold approval for title transfer, rendering its failure to do so unreasonable and outside of its limited discretionary authority. *See* SAC ¶¶ 4; 48; 51; 83; 108; 114; 138; 139. The Developers have therefore adequately alleged property interests meriting Fifth Amendment protection.

Next, the District contends that the Developers' procedural-due-process claim fails because they have not alleged "that they were deprived of notice of the foreclosure or an opportunity to be heard regarding the matter. District Mot. at 37. Procedural due process, however, does not simply require notice and a hearing, it requires *meaningful* notice and a *meaningful opportunity* to be heard. *See Turner v. State of La.*, 379 U.S. 466, 474 (1965).

Due process is a flexible concept that "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). The process required in a particular context may be evaluated based on three factors set forth in *Mathews*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.  Applying those factors, the Supreme Court has rejected procedures that present a high "likelihood of error" because they depend on "one-sided, self-serving, and conclusory submissions."  *Connecticut v. Doehr*, 501 U.S. 1, 14 (1991) (finding prejudgment lien attachment procedures to be constitutionally deficient).  Other examples of an inadequate hearing include one in which biased participants serve as supposed neutrals.  *See Turner*, 379 U.S. at 474. Seizure of property outside of the government's stated authority similarly violates the Fifth Amendment.  *See Elkins v. District of Columbia*, 690 F.3d 554, 564 (D.C. Cir. 2012).

Here, the Developers state a procedural-due-process claim by alleging that the District's defective notice and rigged foreclosure process deprived them of interests in real property.  *See* SAC ¶¶ 87–90.  "[N]otice was deficient and due process lacking for the obvious reason that the District misrepresented the supposed basis for foreclosure, claiming authority under the note that it in fact lacked—and on information and belief, *knew* it lacked."  *Id.* ¶ 87 (emphasis in original). Moreover, "the procedures surrounding the foreclosure sale were [] rigged to favor the District and to deny innocent holders of legitimate interests in the [] Land their just due."  *Id.* ¶ 88.

These allegations amply state a claim under the *Mathews* factors.  First, there can be no dispute that a party with interests in real property has a substantial interest in maintaining its property interest.  Second, the risk that a party with interests in real property will suffer a permanent and wrongful deprivation of his rights under a foreclosure procedure rigged to convey that real property to the government under false auspices and at fire-sale prices is high.  Third,

requiring the District to provide notice that accurately represents its foreclosure authority (or lack

thereof), and a fair foreclosure process is not a daunting burden.  *See Mathews*, 424 U.S. at 335.

Finally, the Developers' due-process claim does not depend upon an express allegation

that they would have participated in the District's rigged foreclosure hearing.  *See Keating v.*

*Nebraska Public Power Dist.*, 562 F.3d 923, 929–30 (8th Cir. 2009) (reversing the district court's

dismissal of the complaint because "[n]othing in the record demonstrates that the [hearing]

would have addressed the specific issues raised in the underlying claim or that it would have

provided a meaningful pre-deprivation opportunity for the appellants to present their claim.").

To the contrary, the absence of any fair auction denied the Developers any fair opportunity to

decide.  Moreover, even if the Developers would have ultimately abstained, the rigged auction

still injured them by depressing the auction price and removing any chance that their stake in any

auction surplus would pay off.  SAC ¶ 79.  The District's motion to dismiss the Developers'

procedural-due-process claim should therefore be denied.

## 2.      The Developers State a Claim for Substantive Due Process.

The District contends that the Developers substantive-due-process claim fails because the

Developers have failed to allege facts that show the District's behavior was "so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience."  District Mot. at 39.

Similarly, NFPH contends that the Developers have not alleged "arbitrary state action."  NFPH

Mot. at 36.  Not only have the Developers made such allegations (*see* SAC ¶¶ 2–4; 78; 87; 98),

the Developers have taken the extra step of attaching to their Second Amended Complaint an

internal e-mail sent from the District's then-Deputy Attorney General Ellen Efros to the District's

then-Attorney General Irvin Nathan in which she indicates that the District's foreclosure was

unlawful; that individuals at the "highest level" of the District's government knew the

foreclosure was unlawful; and that these high level individuals proceeded with the foreclosure

against its own lawyers' advice.  *See* SAC ¶ 4.  If this does not shock the conscience, it is unclear

what else could.  *See Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due

process is protection of the individual against arbitrary action of government.").

Indeed, this is exactly the type of arbitrary government conduct that the due process

clause protects against.  In *Silverman v. Barry*, the D.C. Circuit identified two ways a

government can effect a property deprivation in violation of Due Process, the pertinent one of

which is "a deliberate flouting of the law that trammels significant personal or property rights."

845 F.2d 1072, 1080 (D.C. Cir. 1988).  If a government body or official "did not have authority

for the actions it took regarding" a plaintiff's property, such "actions were ultra vires and, as a

result sufficiently arbitrary to amount to a substantive due process violation."  *Cine Sk8, Inc. v.

Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007).  Here, as discussed, the District did not

have the requisite authority to foreclose and, to make matters worse, it knew as much.

Nevertheless, the District cites a long series of cases all stating, in various language, that

a plaintiff bears a high burden in alleging substantive due process violations.  District Mot. at 39-

40.  None of those cases is instructive here, however, because none of them involves the type of

deliberate and knowingly unlawful conduct involved here.  For instance, the court found in

*Decatur Liquors, Inc. v. District of Columbia*, that a regulation limiting sales of individual beer

cans in an "effort to stem public drunkenness . . . doesn't remotely qualify" as a substantive-due-

process violation.  478 F.3d 360, 363 (D.C. Cir. 2007).  Likewise, *Silverman* would at most

support the proposition that government conduct that is not "ideal" may, nonetheless be

constitutional—such that a series of land use regulations that sometimes temporally overlapped

and sometimes did not, and resulted in "confusion" (rather than "grave unfairness") surrounding

the plaintiff's applications for land use, withstood challenge in that case. 845 F.2d at 1075–80.

Here, in contrast, it is difficult to fathom governmental action more deliberate than misrepresenting its authority to initiate foreclosure proceedings, more egregious than neglecting one's own counsel's advice not to foreclose, or more unfair than rigging the process to acquire the property at dramatically sub-market values.  *See* SAC ¶¶ 2–4; 78; 85–93; 98.  We know of no precedent for any such action by any government, nor do we know of any precedent suggesting that such action comports with due process.  And, tellingly, the District cites none.

NFPH separately advances two additional flawed arguments concerning the Developers' substantive-due-process claim.  First, NFPH contend that the Developers' due-process claim fails because it "is simply a state claim in federal garb."  NFPH Mot. at 36.  Not so.  The Developers have clearly alleged a federal constitutional violation.  To be sure, "[i]n order for the violation to rise to the level of a federal constitutional violation, it must be alleged that the violation was the result of arbitrary state action."  *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 944 (D.C. Cir. 1988) (quoting *United States ex rel. Hoover v. Franzen*, 669 F.2d 433, 445 (7th Cir. 1982) (emphasis in *Comm. of U.S. Citizens*)).  As discussed at great length above, the Developers have adequately alleged—and, indeed demonstrated through the Efros e-mail— arbitrary and deliberate state action.  NFPH's attempt to characterize the Developers' due-process claim as involving "local law" is therefore misguided.[14]

Second, NFPH argues that the Developers' substantive-due-process claim fails "because it is entirely preempted by the Fifth Amendment taking clause claim."  NFPH Mot. at 34.  The

---

[14]   NFPH also relies on various provisions of the Deed of Trust that it claims "validate the District's actions in demanding and carrying out the Foreclosure."  NFPH Mot. at 37.  In making this argument, however, NFPH ignores the allegations of the Second Amended Complaint that the District did *not* have the authority to foreclose.  *See* SAC ¶¶ 4; 26; 28; 76; 87. Furthermore, a jury is to decide any factual questions surrounding whether a government has acted outside of its authority so as to violate due process.  *See Cine Sk8, Inc.* , 507 F.3d at 789 (2d. Cir. 2007) (reversing entry of summary judgment on substantive-due-process claim).

cases NFPH cites in support of this argument apply when a plaintiff is using a due-process claim

to challenge a *land-use regulation*. *See Patel v. Penman*, 103 F.3d 868, 875 (9th Cir. 1996); *see*

*also Armendariz v. Penman*, 75 F.3d 1311, 1324 (9th Cir. 1996).  But this case differs.  Here, the

Developers' due process claim challenges, among other things, the rigged foreclosure auction

itself, including the unfair procedures that surrounded the auction.  *See* SAC ¶¶ 85–93.  The

takings claim, on the other hand, challenges the Defendants' complete dispossession of the

Developers from the Land.  *See id.* ¶¶ 94–100.  Because the Developers' due-process claim is not

covered by the Takings Clause, there can be no preemption.  *See Crown Point Dev., Inc. v. City of*

*Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007) ("The Fifth Amendment would preclude a due

process challenge only if the alleged conduct is actually covered by the Takings Clause.  *Lingle*

[*v. Chevron USA Inc.*, 544 U.S. (2005)] indicates that arbitrary action is not such a challenge.").

### C.     The Developers State A Takings Claim.

"The Fifth Amendment's guarantee that private property shall not be taken for public use

without just compensation was designed to bar Government from forcing some people alone to

bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

*Armstrong v. United States*, 364 U.S. 40, 49 (1960).  To state a valid takings claim, the

Developers need to plead that they 1) possessed a valid property interest and (2) that there was a

taking of that property interest under color of state law, without compensation.  *See Ascom*

*Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 192 (D.D.C. 2012).  The

Developers have adequately pleaded both requirements.

### 1.     The Developers Had A Recognizable Property Interest in the Land.

The District incorrectly contends that the Developers' takings claim fails because the

Developers lacked a property interest in the Land.  District Mot. at 41-43.  This argument relies

on the false premise that takings jurisprudence protects only current title-holders of real property.

But, "[e]very sort of [real property] interest the citizen may possess" counts as a property interest under the Fifth Amendment. *United States v. Gen Motors Corp.*, 323 U.S. 373, 378 (1945).[15] Compensable property interests have been found to exist in interests that the District would likely characterize as "future" or "conditional," including: ownership interests for which title has not yet transferred, *Palazzolo*, 533 U.S. at 630; purchases in a binding executory contract for which title had not transferred, *Cheatham*, 363 F.2d at 585; and remainder interests, whether "contingent or vested," *Brugh v. White*, 103 So. 2d 800 (Ala. 1957). "A living owner of a future interest is generally a necessary party . . . to a proceeding to condemn or take property by the state." *Hemphill v. Miss. State Highway Comm.*, 145 So. 2d 455, 461 (Sup. Ct. Miss. 1962). Improvements made to land by a tenant are also compensable property interests. *See Almota Farmers Elevator & Warehouse Co.*, 409 U.S. at 473. The Second Amended Complaint more than suffices, therefore, to establish one or more cognizable property interests.

### 2.     The Developers Allege A Complete Property Deprivation.

Nor is there any merit to the District's argument that the foreclosure was not a "taking." District Mot. at 43–46. An actionable property deprivation can be stated in one of three ways, by pleading government action: (1) that effects a "permanent physical occupation of real property," frequently referred to as a *per se* taking, *Palazzolo*, 533 U.S. at 617 (citations and internal quotations omitted); (2) that amounts to denial of "all economically beneficial or productive use of land," *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); or (3) that meets

---

[15]     The panoply of protected property interests includes: ownership even in the absence of possessory rights, *e.g. Alama Land & Cattle Co., v. Arizona*, 424 U.S. 295, 303 (1976); valid contracts, *e.g. Lynch v. United States*, 292 U.S. 571, 579 (1934); options for contract renewal, *e.g. United States v. Petty Motor Co.*, 327 U.S. 372 (1946); improvements to land made by a tenant, *Almota Farmers Elevator & Warehouse Co.*, 409 U.S. at 476-77; a mortgagee's lien, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 600 (1935); and easements and restrictive covenants, *In re St. Nicholace Terr.*, 143 N.Y. 621, 621–22 (1894).

a flexible, fact-dependent inquiry of whether the government action imposes some economic

harm, interferes with Plaintiffs' reasonable "investment-backed expectations," and is in the

nature of an eminent domain action. *Penn Central Transp. Co. v. City of New York*, 438 U.S.

104, 124 (1978).  No "set formula" governs when "'justice and fairness' require that economic

injuries caused by public action be compensated by the government, rather than remain

disproportionately concentrated on a few persons." *Id.* (citations omitted).  Here, through the

foreclosure auction, Developers allege a complete physical extinguishment of their interests in

the Land and certainly of their productive use thereof, resulting in a *per se* or complete taking,

under both *Palazzolo* and *Lucas*.  *See* SAC ¶¶ 94–100.   *See Amen v. City of Dearborn*, 718 F.2d

789, 797 (6th Cir. 1983) (de facto taking when the city "chose not to invoke its condemnation

powers, but, rather, elected to engage in a deliberate course of conduct to force the sale of private

property at reduced value" as part of redevelopment plan); *see also Archer Gardens v. Brooklyn

Center Dev. Corp.*, 468 F.Supp. 609, 613 (S.D.N.Y. 1979) (taking occurred through "abuse of

legitimate condemnation powers" where the government tried to appropriate private properties

through tax foreclosure proceedings instead of the previously announced condemnation

proceeding in which it agreed to pay a substantially higher price).

### 3. Alternatively, The Developers Allege A Compensable Deprivation Of Their Property Interests Under the *Penn Central* Factors.

The Developers also state a takings claim under the *Penn Central* factors because they

suffered:  economic harm (SAC ¶ 98) , interference with their reasonable "investment-backed

expectations" (*id.* at ¶ 97), and action in the nature of eminent domain (*id.* at ¶ 99).  *See Penn

Central Transp. Co.*, 438 U.S. at 124.

The District does not dispute that most of these factors apply here.  But the District does

contend that its actions were not in the nature of eminent domain and that the "[t]he government

is not required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." District Mot. at 44 (citing *Bennis v. Michigan*, 516 U.S. 442, 452–53 (1996)). The second part of that sentence is incorrect as a matter of law: *any* "taking" by the Government requires just compensation under the Takings Clause, not just takings accomplished via eminent domain. *See, e.g.*, *Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015) (farmers entitled to just compensation for raisins taken under a federal regulatory regime).[16] And the first part is incorrect as a matter of fact: the District's wrongful foreclosure on the Land here was equivalent to it exercising its powers of eminent domain *See Amen*, 718 F.2d at 797; *Archer Gardens*, 468 F.Supp. at 613. The foreclosure shifted property interests from a few property-rights holders—including the Developers—to the District, in furtherance of the District's effort to make broad public use of the Hospital and surrounding Land. By the District's own account, it "foreclosed upon the Hospital to prevent its insolvency, which would have imperiled the wellbeing of the residents of the District east of the Anacostia River." District Mot. at 46. Given the District's (repeated) allusion to the perceived public imperative for it to claim sway over the Hospital and Land, the District's self-contradictory contention that it acted merely "as a creditor" rather than as a public authority exercising its eminent-domain power rings false. *Id.* at 43. In any event, the District does not identify the supposedly distinct "governmental authority" it was exercising, nor could it, as it lacked any lawful authority to carry out the foreclosure. *See* SAC ¶¶ 4; 26; 28; 76; 87.

---

[16]   The governmental authority at issue in *Bennis* was the State's civil forfeiture power, incident to its criminal enforcement authority, which has no application here. *Bennis*, 516 U.S. at 444. The Supreme Court was speaking to civil forfeiture actions, and those alone, in stating that "actions of the kind at issue are 'too firmly fixed in the punitive and remedial jurisprudence of the country to be now displaced.'" *Id.* at 453.

In a last gasp, the District resorts to contending that "[t]aking action to prevent the collapse of the only hospital in the District of Columbia east of the Anacostia River is the type of action that, even if it involves a physical or regulatory taking of private property, does not require compensation."  District Mot. at 46.  For this remarkable proposition, the District cites Justice Blackmun's *dissenting* opinion in *Lucas*, 505 U.S. at 1040.  But the *majority* in *Lucas*—and in many other Supreme Court cases—made clear that all takings require just compensation under the Takings Clause.  *Id.* 1026–32; *see also Horne*, 135 S. Ct. at 2426; *Kelo*, 545 U.S. at 489.

### D.  The Developers State A Cause Of Action For Wrongful Foreclosure.

The District contends that the Developers' wrongful foreclosure action fails because they have failed to plead facts establishing that (1) the District's foreclosure was wrongful; (2) the Partnership remained in control of its General Partner at the time of the foreclosure; and (3) the Developers had a property interest in the Land at the time of the foreclosure.  District Mot. at 46-49.  All of these arguments fail.

### 1.  The Developers Adequately Allege Facts Supporting Their Wrongful Foreclosure Action.

The District argues that the Developers "have failed to set forth any factual allegations that support their [] legal assertions that the District's foreclosure was wrongful . . . ."  District Mot. at 47.  In actuality, the Second Amended Complaint is replete with factual allegations indicating how and why the District's purported foreclosure was unlawful.  *See* SAC ¶¶ 4; 81; 87; 98.  For example, the Developers allege that "District itself acknowledged the impropriety of the foreclosure in an internal e-mail that has since become public and the subject of media."  *Id.* ¶ 4.  In the e-mail, then-Deputy Attorney General Ellen Efros writes to then-Attorney General Irvin Nathan that the District's decision-makers, including the Mayor's office, proceeded with the foreclosure despite having been advised that it would be unlawful.  *Id.* at ¶14; *see also* ECF

26-1.  The District's instant submission that the foreclosure was beyond legal reproach is therefore incongruous with its internal communications.

The Developers have further alleged that the District violated § 42- 815(b) of the D.C. Code when, without the proper legal authority, it foreclosed on the Land.  SAC ¶ 106.  Section 42-815(b) of the D.C. Code provides that "[n]o foreclosure sale under a power of sale provision contained in any deed of trust . . . may take place unless the *holder of the note* secured by such deed of trust . . . gives written notice . . . ." (emphasis added).  Because the District was not the "holder of the note," its actions violated § 42-815(b).  *Id.*  And the Second Amended Complaint has further detailed how and why the procedures through which the District effectuated the foreclosure were patently unfair and unlawful.  *See id.* ¶¶ 78(a)-(d).

## 2. The GSI Partnership Was Never Dissolved.

The District nonetheless presses a contrary account—according to it which had full authority to enforce the Deed of Trust because the partnership, GSI, had been dissolved.  Although the District maintains that "the Complaint is conspicuously silent as to the actual status of the Partnership at the time of the foreclosure" (District Mot. at 47), the Second Amended Complaint is quite clear on this point: "SHW-GSE ha[d] never effectively withdrawn or been removed from GSI, nor ha[d] the GSI partnership ever been dissolved or amended so as to transfer control of GSI from the general partner (SHW-GSE) to the limited partner (the District)."  SAC ¶ 105.  The Second Amended Complaint further alleges that neither the District, nor GSI, nor SHW-GSE ever filed "an amendment [] with the District of Columbia's Department of Consumer and Regulatory Affairs to indicate that SHW-GSE had withdrawn or been removed from GSI as the general partner."  *Id.* ¶ 76.  Indeed, "GSI's initial certification, as filed with the District's Mayor . . . has continued to list SHW-GSE as GSI's general partner without any change."  *Id.*  Taking those allegations as true, the District has no argument at this stage.

The District nonetheless ignores that this case is still at the pleading stage and advances a different account of the facts, one in which SHW-GSE supposedly had withdrawn as the general partner of GSI so as to entitle the District acting alone to foreclose on the Land.  *See* District Mot. at 46-49.  Notably, the District made essentially the same argument in prior litigation against CMC Realty and SHW-GSE.  *See CMC Realty, LLC v. Fenty*, 2010 CA 004571 B (D.C. Sup. Ct. April 25, 2011) (attached hereto as Exhibit A, hereinafter referred to as the "Foreclosure Action"); *see also* SAC ¶ 82.  But the Honorable Franklin Burgess Jr. rejected the argument in denying the District's motion for summary judgment.  *See* Exhibit A at 14–21.  Judge Burgess recognized that, contrary to the District's position, a "reasonable juror could conclude that the Partnership was not validly dissolved" and therefore the issue of dissolution had to be resolved at trial, not in motions practice.  *Id.* at 20.  For the same reasons that the District was not entitled to *summary judgment* in D.C. Superior Court, it follows *a fortiori* that it is not entitled to dismissal at the pleadings stage here.  *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 (D.C. Cir. 1987) ("[W]hile a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff.").

### 3.      The Developers Have A Property Interest In The Land.

Finally, the District argues that the Developers' wrongful-foreclosure claim should be dismissed because they "had no actual property interest in the Development Land at the time of the foreclosure."  District Mot. at 48.  But, as discussed at length in Sections II.A.1-3, IV.B, and IV.C, the Developers did have property interests in the Land.   Well before the foreclosure even occurred, the Developers maintained preexisting, established development rights and interests to the Land, including the right to earn development fees, rental payments, and other profits from developing the Land.  *See* SAC ¶¶ 43–46.  Additionally, the Developers had spent large sums of

money improving the Land and preparing it for development by, among other things, the survey and subdivision.  *See id.* ¶¶ 34–38.  These rights, interests, and improvements, which were in no way dependent upon any ensuing approval by the District and were effectively taken or destroyed by the foreclosure, are sufficient to establish the Developers' property interest in the Land.  *See Pizzini v. Bank of Am., N.A*, 2012 WL 1834052, at *2 (W.D. Tex. May 18, 2012).

### E.     The Developers State Claims For Specific Performance & Constructive Trust.

The District argues that the Developers' claims for specific performance and constructive trust fail because (1) the Developers cannot both seek equitable relief and damages; (2) the Developers cannot seek this type of equitable relief against the District; and (3) the Developers were not able to perform their obligations under the Partnership Agreement.  District Mot. at 49–54.  These arguments fail, however, because they, like most of the District's arguments, disregard the allegations in the Second Amended Complaint and reflect misconceptions about the law.

### 1.     The Developers May Plead Alternative Theories of Recovery.

Under Federal Rule of Civil Procedure 8(e)(2), a plaintiff may plead alternative theories of liability, regardless of whether those theories are consistent.  Likewise, the Developers may plead alternative theories of recovery, even if those conflict.  *See Scott v. Dist. of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996) (plaintiffs can "properly plead alternative theories of liability, regardless of whether such theories were consistent with one another").  It would therefore be premature to dismiss the Developers' claims for specific performance and constructive trust just because the Developers also have pleaded claims seeking damages.  *See United States v. Kensington Hosp.*, 760 F.Supp. 1120, 1135 (E.D. Pa. 1991) (dismissal of unjust enrichment claim premature where federal rules allow pleading alternative theories of recovery).[17]

---

[17]    The District relies on *District of Columbia v. Wical Ltd. P'ship.*, 630 A.2d 174, 184 (D.C. 1993), to support its argument that the Developers cannot simultaneously pursue claims

The District also argues that the Developers have failed to allege that they lack an adequate remedy at law.  District Mot. at 50.  Not true.  The Developers have alleged that their "interest in the [] Land as rightful owner is unique and valuable" and that as a result the Developers "have suffered irreparable harm for which there is no adequate remedy at law."  SAC ¶ 115.  This allegation suffices to ground claims for specific performance and constructive trust, especially because "[w]hen land is the subject matter of the agreement, the legal remedy is assumed to be inadequate, since each parcel of land is unique."  *Independence Mgmt. Co., Inc. v. Anderson & Summers, LLC*, 874 A.2d 862, 870 (D.C. 2005).

### 2. The Developers Are Entitled To Seek Specific Performance and Constructive Trust Against the District.

The District argues that the Developers' actions for specific performance and constructive trust must be denied because the District "may not be subjected to order directing the conveyance of District real estate for the benefit of private litigants."  District Mot. at 52.  This argument, however, presupposes that the Hospital and the Land rightly belong to the District— which they do not.  The District does not, and cannot, seriously contend that a private citizen or corporation that has its property wrongfully seized by a municipality is unable to seek the return of that property.  Where a government actor has acted *ultra vires* to improperly seize a private citizen's assets, the law is clear that the proper remedy is return of those assets—in this case, the Land.  *See, e.g.*, *United States v. Marolf*, 173 F.3d 1213, 1216 (9th Cir. 1999) (inadequately noticed forfeitures are void and government may not initiate judicial forfeiture proceedings after limitations period expires; government must return property, absent application of laches or

---

seeking both equitable and legal remedies.  *Wical* is inapposite, however, because it was decided on a summary judgment motion.  At the motion-to-dismiss phase, plaintiffs can pursue different and contradictory theories of recovery.  *See In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 238 (M.D. Pa. 2010) ("[a]lthough the plaintiffs will eventually be forced to choose a single path of recovery, they need not do so at the pleading stage").

principles of equitable tolling); *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 505

(6th Cir. 1998) ("If the Government seized, for example, a pregnant cow and, after the cow gave

birth, the Government was found not to be entitled to the cow, it would hardly be fitting that the

Government return the cow but not the calf.").

### 3.      The Developers Are Entitled To Specific Performance Because They Were Ready, Willing And Able To Perform The Operating Agreement.

The District contends that the Developers are not entitled to specific performance because

they were not "ready, willing, and able" to perform under the Operating Agreement since

performance under that agreement was "impossible."  District Mot. at 53.  That the District never

approved CMC Realty's request to transfer title of the Land to the Developers does not mean that

the Developers were not ready, able, and willing to perform their part of the Operating

Agreement.  They are so positioned now, just as they were previously.  *See* SAC ¶¶ 34–51.

In any event, "literal and exact performance by a [party] is not always necessary as a

condition to securing specific performance of a contract . . . ."  *Fairview Vill. Dev. Corp. v.

Amberhill Properties, LP*, 99 F. App'x 87, 89 (9th Cir. 2004).  "A court may award specific

performance on an equitable basis."  *Id.*; *see also Gatewood v. U.S. Cellular Corp.*, 953

F.2d 1393, 1397 (D.C. Cir. 1992) (stating that a court may order specific performance of a

contract at variance with its literal terms, if it "identifies equitable justifications" so as "to fulfill

the parties' actual intention, or to remedy harm caused by unconscionable or inequitable conduct

by one of the parties").  Thus, in situations where, as here, a defendant's inequitable conduct has

foreclosed the plaintiff from performing his literal obligations under an agreement, courts will

still grant specific performance.  *See Malik Corp. v. Tenacity Grp., LLC*, 961 A.2d 1057, 1062-63

(D.C. 2008) (granting specific performance despite the party's literal inability to perform under

the agreement "[b]ecause the only bar to the performance of the [c]ontract was Malik's refusal to

execute the sale and Tenacity showed themselves as ready, willing and able to purchase the

property"). Because the District repeatedly assured the Developers of its intent to approve the

transfer of title (*see* SAC ¶¶ 48; 51; 73; 114; 139–40), the District cannot now rely on its own

failure to fulfill these promises as a basis for denying the Developers' specific performance. *See*

*Johnson v. Vill. of Lansing*, 1995 WL 54455, *3 (N.D Ill. Feb. 7, 1995) (stating that "[a] contract

which could not be specifically enforced because certain conditions precedent did not occur may

be enforced if the provisions could have been performed" and that "[a] party cannot raise its own

failure to comply with an agreement as a bar to enforcement" nor can a "party [] take advantage

of his own conduct to claim the failure of a condition to defeat his" obligations).

### F.    The Developers State A Claim For Tortious Interference With A Prospective Economic Relationship.

The District argues that the Developers' tortious-inference claim fails for two reasons  but

both of the District's arguments disregard the Developers' allegations. *See* District Mot. at 54-56.

First, the District argues that the Developers have "fail[ed] to allege that [their]

anticipation of alleged business expectancy was 'commercially reasonable'" because the

Developers' business expectancy was contingent upon the occurrence of a future event. *Id.* at 55.

But the reasonableness of the Developers' business expectancy is not properly addressed at the

motion to dismiss stage. *See, e.g.*, *Browning v. Clinton*, 292 F.3d 235, 242–43 (D.C. Cir. 2002)

("discovery and summary judgment motions, not Rule 12(b)(6) dismissals, are the appropriate

vehicles for weeding out unmeritorious [tortious interference] claims"). In any event, if the

District were correct that a business expectancy contingent upon the occurrence of a future event

could not be commercially reasonable, no plaintiff could ever bring a claim for tortious

interference with a prospective economic advantage because, by its very nature, tortious

interference with a prospective economic advantage is contingent upon the occurrence of a future

event and involves uncertainties.  Courts have thus rejected the District's argument.  "[W]here a prospective advantage is alleged, the plaintiff need not demonstrate a guaranteed relationship because 'anything that is prospective in nature is necessarily uncertain." *In re McWade Properties, LLC*, 2012 WL 5897184, *7 n.5 (Bankr. D.D.C. Nov. 7, 2012).  Tortious interference with a prospective economic advantage does not "deal[] with certainties, but with reasonable likelihood or probability."  *Id.*

As the Second Amended Complaint alleges, the District had "repeatedly offered assurances that it would support the transfer [of title to the Land] as agreed, and that any and all questions it had posed towards that end had been fully addressed in good faith."  SAC ¶ 114; *see also id.* ¶¶ 48; 51; 83; 108; 138; 139.  Thus, far from "mere hope" or "innate optimism," the Developers had received express promises from the District that it would approve CMC Realty's transfer of title.  Moreover, the District actively encouraged the Developers to undertake development plans and various other development activities for the sake of developing the Land.  *See id.* ¶¶ 39; 48; 136; 146.  This encouragement alone is sufficient to establish that the Developers' business expectancy was commercially reasonable.  *See Browning*, 292 F.3d at 242 (concluding that plaintiff "had a reasonable expectation of selling her book to a publisher" where she was "encouraged" by a book editor "to continue working on her book").  Accordingly, the Developers have adequately alleged "a commercially reasonable anticipation of a future business relationship."  *Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, 2006 WL 1147933, *6 (D.D.C. Apr. 28, 2006); *see also PM Servs. Co. v. Odoi Associates, Inc.*, Case No. 03-1810, 2006 WL 20382, *34 (D.D.C. Jan. 4, 2006) (stating that "[f]or the most part the 'expectancies' thus protected have been those of future contractual relations").

Second, the District argues that the Developers' tortious-interference claim fails because the "foreclosure [] could not have caused CMC Realty and SHW-GSE to breach [the Operating Agreement]," as the District's consent was required before CMC Realty could transfer title to Developers.  District Mot. at 56.  This argument fails, however, because claims for tortious interference that involve a prospective business relationship require only that a plaintiff allege that he or she had been given "reasonable assurance[s] that the contract or relationship would have been entered into [.]"  *S. Union Co. v. Sw. Gas Corp.*, 165 F. Supp. 2d 1010, 1040 (D. Ariz. 2001).  As noted, the District repeatedly assured the Developers that it would approve CMC Realty's request to transfer title of the Land to the Developers.  *See* SAC ¶¶ 4; 48; 51; 83; 108; 114; 138; 139.  The Developers therefore had "reasonable assurances" that their prospective business relationship with CMC Realty, as contemplated by the Operating Agreement, would materialize.  The District cannot hide behind its broken promises to approve the transfer of title as a basis for denying the Developers' injury.  *See, e.g.*, *CASCO Marina*, 834 A.2d at 84 ("[i]f it is established that [an agency of the District]  withheld its consent merely in order to 'leverage' a better bargain for the District, that would constitute intentional interference with either a contract or business expectancy for purposes of a 12(b)(6) motion to dismiss"); *S. Union Co.*, 165 F. Supp. 2d at 1040 (existence of regulatory approval as a condition precedent to completion of a merger does not prevent a plaintiff from prevailing on a cause of action for tortious interference).

### G.     The Developers State A Claim For Breach Of Contract As A Third-Party Beneficiary.

Finally, the District contends that the Developers' third-party-beneficiary claim fails because the Developers have "not alleged that the GSI Partnership Agreement provided for the Developers to develop . . . the Development Land."  District Mot. at 57.  The Partnership Agreement, however, need not contain an explicit reference to the Developers for them to have

been intended third-party-beneficiaries; rather, "intent may be adduced if it is not expressly

stated in the contract." *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d

1055, 1066 (D.C. 2008); *see also Monument Realty LLC v. Washington Metro. Area Transit

Auth.*, 535 F. Supp. 2d 60, 70 (D.D.C. 2008) (denying dismissal of third-party-beneficiary claim

because "whether Monument was an intended third-party beneficiary of the agreement between

the District of Columbia and WMATA, [requires] the Court [] to consider that agreement and its

terms, as well as evidence outside the pleadings") (emphasis added); *Roedler v. N. States Power

Co.*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) ("When the intent to benefit the third party is not

expressly stated in the contract, evidence thereof may be adduced."). "[O]ne way to ascertain

such intent is to ask whether the beneficiary would be reasonable in relying on the promise as

manifesting an intention to confer a right on him." *Id.* (citing Restatement (Second) of Contracts

§ 302(1)(b) cmt. (d)). "Under this refined test concerning intended beneficiary status, [this

Court's] inquiry is whether [the Developers] would be reasonable 'in relying on the promises of

the [District] as manifesting an intention to convey a right on them . . . .'" *Id.*

Here, there can be little doubt that the Developers reasonably relied on the numerous

promises made by the District over the course of several years. *See* SAC ¶¶ 4; 51; 83. Indeed,

the District's manifestation of its intent to tap the Developers to develop the Land was evident

from as early as November 2007. At that time, it was already accepted and understood by the

District that the Developers would be developing the Land. *See id.* ¶¶ 36-38. Documents

appended to the Partnership Agreement even go so far as to reference the "developer" of the

Land, which, as the Developers allege, both parties understood to be the Developers. *Id.* ¶ 121;

*see also* ECF 72-2. It was based on this understanding that the Developers created UMC

Development just two days prior to the execution of the GSI Partnership Agreement, for the purpose of further developing the Land.  *Id.* ¶ 30.

Over the course of the next several years, the Developers continued to develop the Land, as was known and encouraged by the District.  *See id.* ¶¶ 4; 51; 83; 108; 114; 138; 139.  These development efforts continued "up until the District unlawfully foreclosed on the [] Land in July 2010."  *Id.* ¶ 51.  At no point prior to the foreclosure did the District ever tell the Developers to "stop" or "slow down."  *Id.* ¶ 48.  Rather, "the District actively encouraged the Developers to continue their development activities every step of the way and assured them that the District's approval for transfer of title would promptly be forthcoming."  *Id.*  "The Developers therefore retained every reasonable expectation of continuing to derive fair returns on their investment and contributions over the course of the ensuing life of the property, which was expected to appreciate in value and to throw off continuing returns over the course of decades."  *Id.*  As such, the Developers' claim for breach of contract as a third party beneficiary should not be dismissed.

## V.       THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION

As a matter of simple fairness, this Court should exercise supplemental jurisdiction over the Developers' state-law claims.  While it is true that the Developers previously advocated that the Court decline to exercise its supplemental jurisdiction, the circumstances surrounding this case have dramatically changed since July 2013 when the Developers advanced that argument. In the interim, the D.C. state courts have firmly indicated that they are unwilling to adjudicate the Developers' state-law claims on the merits.  It is therefore appropriate for this Court now to exercise its supplemental jurisdiction to ensure that these claims are heard and resolved on the merits.  *Cf. Sinclair v. Kleindienst*, 711 F.2d 291, 293–94 (D.C. Cir. 1983) (transfer particularly appropriate where the case would be barred by statute of limitations if dismissed)

The Developers therefore respectfully urge this Court to exercise its supplemental jurisdiction over these claims.  Such a result would serve the interests of fairness and justice, particularly in light of the Defendants' assertion that the Developers' claims would otherwise be time-barred.

### CONCLUSION

For the foregoing reasons, the Court should grant the Developers' motion for leave to amend their complaint and deny the Defendants' motions to dismiss.

DATED:    October 19, 2015                          QUINN EMANUEL URQUHART &
                                                    SULLIVAN, LLP


                                                    */s/ Derek L. Shaffe*r
                                                    Derek L. Shaffer (Bar No. 478,775)
                                                       derekshaffer@quinnemanuel.com
                                                    Jonathan Cooper
                                                       jonathancooper@quinnemanuel.com
                                                    Scott Lerner
                                                       scotlerner@quinnemanuel.com
                                                    Selina MacLaren
                                                       selinamaclaren@quinnemanuel.com
                                                    777 6th St. NW, 11th Floor
                                                    Washington, DC 20001
                                                    (202) 538-8000
                                                    (202) 538-8100 (fax)

                                                    *Attorneys for Plaintiffs*
                                                    *UMC Development, LLC and*
                                                    *Jacksophie GSCH, LLC*

64

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 19th day of October, 2015, true copies of the foregoing Consolidated Reply In Support Of Motion For Leave To File Second Amended Complaint And Opposition To The Defendants' Motions To Dismiss were served by the Court's electronic filing system on registered users:

DISTRICT OF COLUMBIA,

MURIEL BOWSER, in her official capacity as Mayor of the District of Columbia,

and

NOT-FOR-PROFIT-HOSPITAL, CORP.

I further certify that on October 19, 2015, I caused the foregoing to be filed electronically with the Clerk of the Court.

/s/ *Derek L. Shaffer*

Derek L. Shaffer (Bar No. 478,775)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
777 6th St. NW, 11th Floor
Washington, DC 20001
(202) 538-8000
(202) 538-8100 (fax)
derekshaffer@quinnemanuel.com
