# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UMC DEVELOPMENT, LLC, *et al.*, | |
| *Plaintiffs,* | |
| v. | No. 13-cv-0899 (DLF) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| *Defendants.* | |

## MEMORANDUM OPINION

Plaintiffs UMC Development, LLC, and Jacksophie GSCH, LLC, brought this suit in 2013 against the District of Columbia, its Mayor, and a Not-for-Profit Hospital Corporation (NFPHC) created under D.C. law.  Second Am. Compl. ¶¶ 9–13, Dkt. 88.  According to UMC, the District unlawfully foreclosed on land that UMC eventually expected to own and in which UMC had made significant investments.  *Id.* ¶¶ 2–6.  UMC filed its latest complaint following a series of D.C. and federal court proceedings.  It alleges violations of the Takings Clause, the Due Process Clause, and District of Columbia law, and it seeks, among other things, just compensation for the taking of its alleged property and injunctive relief rescinding the foreclosure and transferring title to the property to UMC.  *See id.* ¶¶ 85–156.  Before the Court are two motions to dismiss filed by the District of Columbia and NFPHC.  D.C.'s Mot., Dkt. 93; NFPHC's Mot., Dkt. 94.  For the reasons that follow, the Court will grant the motions.

## I.     BACKGROUND

The Court divides its discussion of the factual and procedural background into two parts.  First, it discusses the formation of the relevant contractual relationships and the foreclosure that ultimately prompted this lawsuit.  Second, it summarizes the procedural history.  In considering

the defendants' motions to dismiss, the Court accepts as true all material allegations in the complaint.  *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008).

**A.      The Facts**

1.      *Greater Southeast Investments, L.P., Capitol Medical Center, LLC, and Capitol Medical Center Realty*

In 2007, the District of Columbia attempted to save a failing hospital in the Anacostia neighborhood by contracting with, and providing funding to, a private company that would acquire and rehabilitate the hospital.  Second Am. Compl. ¶¶ 14–16, 20–21.  To permit the transfer of funds, the Council of the District of Columbia enacted the East of the River Hospital Revitalization Emergency Amendment Act of 2007, which authorized the District to enter into a limited-partnership agreement with Specialty Hospital of Washington-GSE Holdings, LLC (SHW-GSE), a wholly owned subsidiary of Specialty Hospitals of America, LLC (SHA).  *Id.* ¶¶ 19–22.  The District, the sole limited partner, then provided $49 million in equity capital to the partnership, which became known as Greater Southeast Investments, L.P. (GSI).  *Id.* ¶ 22.  SHW-GSE served as the sole general partner.  *Id.* ¶ 21.

The partnership agreement significantly limited the District's authority over GSI's dealings.  The District could not, for example, "take part in the operation, management, or control of the Partnership [or] transact any business in the Partnership's name."  D.C.'s Mot. Ex. 1 ¶ 5.2, at 12, Dkt. 93-1.  But SHW-GSE's authority over GSI was not unlimited either.   Most importantly, SHW-GSE could not "cause the Partnership to sell, transfer or otherwise dispose of any property or assets in a single transaction or series of related transactions" without "obtaining the prior written approval" of the District.  *Id*. Ex. 1 ¶ 4.2, at 5.

Around the same time, SHW-GSE's parent company, SHA, established two limited liability companies to further its development plans.  Second Am. Compl. ¶ 24.  It created

Capitol Medical Center, LLC (CMC) to operate the hospital. And it created CMC Realty to own the real property, including the land surrounding the hospital. *Id.*

On November 7, 2007, GSI loaned $49 million to CMC and CMC Realty after executing a series of loan agreements and notes secured by a Deed of Trust. *Id.* ¶¶ 25, 27. The Deed of Trust provided that GSI could foreclose on the secured property in the event that CMC or CMC Realty defaulted. *Id.* ¶ 28; D.C.'s Mot. Ex. 2 ¶ 5.1(e), Dkt. 93-2. GSI and the two CMC companies also executed an Acquisition Loan Agreement that prohibited the CMCs from "[d]ispos[ing], convey[ing], transfer[ing], licens[ing] the use of, or encumber[ing], or permit[ting] the conveyance, transfer or encumbrance of, any part of the Property" without GSI's "prior approval (which may be given or withheld in [its] sole and absolute discretion)." D.C.'s Mot. Ex. 3 ¶ 11, Dkt. 93-3. It is undisputed that, together, these contracts prohibited the transfer of any part of the relevant property without the District's prior approval.

### 2. *UMC Development, LLC*

A few days before these contracts were executed, SHW-GSE contracted with Jacksophie GSCH, LLC to form a joint venture—later named UMC Development, LLC—to acquire and develop the land surrounding the hospital. Second Am. Compl. ¶ 30; D.C.'s Mot. Ex. 4, Dkt. 93-4. CMC Realty also signed the Operating Agreement for the joint venture "for the purpose of confirming its obligations under [the Agreement]." D.C.'s Mot. Ex. 4 at 25. The Operating Agreement stated, "It is presently anticipated that CMC Realty . . . shall initially acquire title to the [l]and upon the closing of the Asset Purchase Agreement." *Id.* ¶ 3. It went on to state that CMC Realty was to cooperate with Jacksophie to subdivide the property by obtaining multiple assessment and tax lots from the D.C. Office of Tax and Revenue. *Id.* According to the Operating Agreement, "promptly following [the] assignment of separate . . . lots . . ., SHW-GSE and CMC [Realty] shall convey title to the [d]evelopment [l]ots to [UMC]." *Id.*

In the same paragraph, the Operating Agreement referenced the Acquisition Loan Agreement that prohibited both CMC and CMC Realty from transferring "any part of the [p]roperty" without the prior approval of GSI—and, by extension, the District. D.C.'s Mot. Ex. 3 ¶ 11; *see also* D.C.'s Br. at 3–4. The Operating Agreement stated that "CMC [Realty] acknowledges that it is funding the acquisition of the [l]and pursuant to the terms and conditions of the Acquisition Loan." D.C.'s Mot. Ex. 4 ¶ 3. And it stated that Jacksophie and SHW-GSE "acknowledge and agree that it is presently their intent in accordance with the terms and provisions of the Acquisition Loan to have [UMC] construct buildings and other structures on the [d]evelopment [l]and . . . for medical uses complimentary to the [h]ospital." *Id.*

UMC immediately invested significant resources into developing the land surrounding the hospital. Second Am. Compl. ¶¶ 37–46. For example, it obtained the District's approval for the creation of multiple tax lots, it engaged a company to help develop comprehensive redevelopment plans, it signed a lease agreement and received rental payments, and it attempted to finalize deals with other potential tenants. *Id.*

UMC and Jacksophie (collectively, the Developers) allege that the District participated in weekly meetings about the progress of their work, *id.* ¶ 47, that it actively encouraged them to continue their development activities, and that it "assured [the Developers] that the District's approval for transfer of title would promptly be forthcoming," *id.* ¶ 48. "At no point prior to [July 2010] did the District indicate to the Developers that it did not intend to approve the transfer of title from CMC Realty to the Developers." *Id.*

Yet when CMC Realty requested that the District approve the transfer in 2008, it withheld its consent and "requested that the Developers provide it with additional information about their development plans." *Id.* ¶ 50. It also failed to provide its consent after the

Developers wrote to it in 2010 "to make sure that [it] was still aware . . . that SHW-GSE and CMC Realty were contractually obligated to convey title to the development lots to Jacksophie." *Id.* ¶ 69 (internal quotation marks omitted). Indeed, the District "never formally responded to CMC Realty's request to transfer title to the [d]evelopment [l]and." *Id.* ¶ 51.

        3.    *The 2010 Foreclosure*

Unfortunately, chronic mismanagement of the hospital led the District to conclude in early 2010 that the hospital was in "imminent danger of financial insolvency." *Id.* ¶ 65 (internal quotation marks omitted). In April 2010, the District "unilaterally purported to declare a default under the Deed of Trust," alleging that the CMC companies "had failed to make required loan payments in 2009, had failed to disclose material facts to GSI, had committed fraud against GSI, and had made material misrepresentations to GSI." *Id.* ¶ 67. On June 3, 2010, the District filed a Notice of Foreclosure that stated that the District was the "Holder of the Note" secured by the Deed of Trust. *Id.* ¶ 72, 74–75. On July 9, 2010, the District purchased the hospital and land "for a mere fraction of their actual market value" at a foreclosure auction at which it was the only bidder. *Id.* ¶ 78–79.

According to the Developers, it is no surprise that the District was the only bidder in light of the participation requirements that the District itself imposed. *Id.* For example, all bidders other than the District had to post a $1,000,000 deposit subject to forfeiture "in the event a final settlement did not occur within thirty days." *Id.* ¶ 78(a). The District also reserved the right to block any sale and retain the purchaser's deposit if, "at any point prior to settlement," the purchaser failed to demonstrate its ability to operate the hospital "on terms satisfactory" to the District. *Id.* ¶ 78(b) (internal quotation marks omitted). And the District "indicated that it would announce entirely new transactional terms—known only to the District—at the auction itself." *Id.* ¶ 78(c). The parties do not dispute, at least at this stage, that GSI, not the District, was the

holder of the note, and that the District had no authority under the GSI partnership agreement (or otherwise) to unilaterally foreclose on the hospital and the land. *See id.* ¶ 75–76.

Three days after the foreclosure sale, the District transferred the purchased assets to NFPHC, an instrumentality of the District that was created through the enactment of the Not-for-Profit Hospital Corporation Establishment Emergency Act of 2010. *Id.* ¶¶ 13, 80.

### B.     Procedural History

This is not the first time the facts of this case have been litigated.  There have been at least six lawsuits related to the D.C. hospital.  Omnibus Order on Summ. J., *Capital Behavioral Health, LLC v. District of Columbia*, No. 2011 CA 9881B (D.C. Super. Ct. Apr. 11, 2014), NFPHC's Mot. Ex. H at 9, Dkt. 94-9.  For example, just before the date of the foreclosure auction, the CMC companies sued the District in D.C. Superior Court and moved for a temporary restraining order to prevent the foreclosure.  That motion was denied on July 6, 2010, Order, *CMC Realty, LLC v. Capitol Medical Cent., LLC*, No. 2010 CA 4571B (D.C. Super. Ct. July 6, 2010), D.C.'s Mot. Ex. 5, Dkt. 93-5, and the CMCs eventually settled their claims against the District, *see* Joint Notice and Stipulation of Dismissal, *CMC Realty, LLC v. District of Columbia*, No. 2010 CA 4571B (filed Nov. 10, 2011).  It is undisputed that UMC failed to intervene in that litigation or to otherwise challenge the foreclosure.

On May 31, 2013, the Developers filed this lawsuit against the District and its Mayor in D.C. Superior Court.  *UMC Dev., LLC v. District of Columbia*, 982 F. Supp. 2d 13, 15 (D.D.C. 2013).  They alleged, among other things, wrongful foreclosure, breach of contract, unjust enrichment, and violations of the Due Process Clause and the Takings Clause.  *Id.*  After the defendants removed the case to this Court, the previously assigned judge declined to exercise supplemental jurisdiction over the D.C. claims, remanded those claims to D.C. Superior Court, and severed and dismissed without prejudice the two constitutional claims.  *Id.* at 20–21.  The

Developers then filed an amended complaint in this Court that reasserted their constitutional claims against the District, its Mayor, and NFPHC, First Am. Compl., Dkt. 33, and the Court stayed the proceedings pending resolution of the D.C. claims, Dec. 5, 2013 Order, Dkt. 45.

Both the D.C. Superior Court and the D.C. Court of Appeals held that the Developers lacked standing to prosecute their D.C. claims, all of which derived from the District's foreclosure. *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 39 (D.C. 2015). The D.C. Court of Appeals reasoned that "UMC Development's interest (and by extension Jacksophie's interest) [in the land] was a contingent future interest that could not mature into an actual present interest without the District's consent to the transfer of title from CMC Realty to the developers." *Id.* at 45. It then explained that it could not "trace the developers' loss of their contingent future interest to the foreclosure." *Id.* Instead, the Developers lost their interest because "the District never consented to transfer title to the developers." *Id.* It stressed that, "[e]ven after the foreclosure, the District still could have" "given UMC Development title directly." *Id.* The D.C. Court of Appeals reversed the Superior Court only "to the extent that [its] order dismissed the developers' claims with prejudice," *id.* at 49, because the standing "defect" was "one of subject matter jurisdiction" and "[s]uch defects may only result in a dismissal without prejudice," *id.* at 48.

Returning to this Court, the developers moved to file a second amended complaint. Mot. for Leave to File Second Am. Compl., Dkt. 62. The undersigned was then assigned to the case and granted the motion over objection. Feb. 1, 2018 Minute Order. The Second Amended Complaint now seeks declaratory and injunctive relief as well as damages based on nine counts: a Due Process Clause violation, a Takings Clause violation, wrongful foreclosure, specific performance of the UMC Development Operating Agreement, tortious interference with

prospective economic advantage, third-party breach of the GSI partnership agreement, unjust enrichment, constructive trust, and quantum meruit.  Second Am. Compl. ¶¶ 85–156.  As in their previous complaints, all of the Developers' claims derive from, in the words of the Developers, "the District's wrongful foreclosure on the [hospital] and its surrounding real property . . . and the improprieties that tainted those proceedings."  *Id.* ¶ 1.  NFPHC and the District, on behalf of itself and its Mayor, have since filed separate motions to dismiss on a variety of grounds, including lack of jurisdiction.

## II.     LEGAL STANDARD

A court must dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1) if it lacks subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1), (h).  As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing jurisdiction, including standing to sue and supplemental jurisdiction.  *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016).  At the pleading stage, a court must "accept all of the factual allegations in the complaint as true," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (alteration adopted and internal quotation marks omitted), and it must construe the complaint "with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact," *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005).  But to assure itself of jurisdiction, the court may also "consider . . . undisputed facts evidenced in the record" and even "undisputed facts plus the court's resolution of disputed facts."  *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation marks omitted).

## III.    ANALYSIS

The Court divides its analysis into two parts.  First, it explains that the Developers' federal claims fail for lack of jurisdiction.  Second, it explains that issue preclusion bars

consideration of their D.C. claims and even if it did not, the Court would decline to exercise supplemental jurisdiction over them.

## A. The Federal Claims

Under Article III of the Constitution, federal courts may decide only "Cases" and "Controversies." U.S. Const. art. III. The familiar doctrine of standing "gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (alteration adopted and internal quotation marks omitted). It "serves to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to a properly judicial role." *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks and citations omitted).

As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing the "irreducible constitutional minimum" of standing. *Id.* (internal quotation marks omitted). Specifically, the plaintiff must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* At the pleading stage, "the plaintiff must clearly allege facts demonstrating each element." *Id.* (alteration adopted and internal quotation marks omitted). Moreover, because "standing is not dispensed in gross," "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks omitted).

The Developers argue that the District violated the Takings Clause and the Due Process Clause of the Fifth Amendment. The Court will address each argument in turn.

1.      *The Takings Claim*

The Takings Clause of the Fifth Amendment, which applies to the States through the Fourteenth Amendment, *Phillips v. Washington Legal Found.*, 524 U.S. 156, 163 (1998), provides that "private property" shall not "be taken for public use, without just compensation," U.S. Const. amend. V.  To establish standing to sue under the Clause, a plaintiff must have a protected property interest in the relevant property.  *Rumber v. District of Columbia*, 595 F.3d 1298, 1300–01 (D.C. Cir. 2010) (per curiam) (holding that the lack of a property interest deprives a plaintiff of standing to bring a takings claim); *see also id.* ("The property-owning businesses, not their employees or stakeholders, are the proper parties to bring suit opposing condemnation.").  Because the Constitution does not create property interests, courts must look to "existing rules or understandings that stem from an independent source such as state law" to determine whether a protected property right exists.  *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980) (internal quotation marks omitted); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992).  "[A] mere unilateral expectation or an abstract need is not a property interest entitled to protection."  *Webb's Fabulous Pharmacies*, 449 U.S. at 161.

The Developers maintain that they are entitled to "just compensation" for the District's "uncompensated taking of private land for public use."  Second Am. Compl. ¶ 95.  They allege that they had "rightful ownership of the [d]evelopment [l]and," *id.* ¶ 96, and were "entitled to hold fee simple title to the [d]evelopment [l]and," *id.* ¶ 98.  They also allege that Jacksophie "had formed a reasonable, investment-backed expectation that it would derive fair returns from its investments in the [d]evelopment [l]and."  *Id.* ¶ 97.  None of these allegations withstand scrutiny.

The "dimensions" of the Developers' property interest are defined by reference to state law, *Roth v. King*, 449 F.3d 1272, 1284 (D.C. Cir. 2006) (internal quotation marks omitted), and the D.C. courts have already ruled that the Developers did not have "rightful ownership" of the land, Second Am. Compl. ¶ 96. They had only a "contingent future interest that could not mature into an actual present interest without the District's consent to the transfer of title from CMC Realty to the developers." *UMC Dev.*, 120 A.3d at 45.

Whether this contingent future interest amounts to a constitutionally protected property interest is a question of federal law. *See Roth*, 449 F.3d at 1285; *see also Foggy Bottom Ass'n v. D.C. Office of Planning*, 441 F. Supp. 2d 84, 89 n.3 (D.D.C. 2006) ("A property interest is the same under the Fifth Amendment due process clause as under the Fifth Amendment takings clause."). As the Ninth Circuit has explained, "the relevant inquiry [under the Takings Clause] is the certainty of one's expectation in the property interest at issue." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1002 (9th Cir. 2007), *aff'd on other grounds*, 553 U.S. 591 (2008). That is why interest on a principal is generally considered protected property. *Webb's Fabulous Pharmacies*, 449 U.S. at 161, 164–65 (interest on interpleader funds); *Phillips*, 524 U.S. at 159–60 (interest on client funds held by an attorney in connection with the practice of law). In *Webb's Fabulous Pharmacies*, for example, the Supreme Court held that interest on interpleader funds deposited in the registry of a county court was the protected property of creditors. In so holding, it stressed "[t]he usual and general rule . . . that any interest on [a] fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal." *Webb's Fabulous Pharmacies*, 449 U.S. at 162. And it explained that the creditors there "had more than a unilateral expectation." *Id.* at 161.

On the other hand, the Supreme Court has ruled in the context of government entitlements that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion" because "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it"; "[h]e must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks omitted). Following this guidance, the D.C. Circuit has held that an order changing the government payment eligibility of certain attorneys appointed to represent indigent clients did not implicate a protected property right. *Roth*, 449 F.3d at 1285–86. It explained that the attorneys' "desires for compensated appointments amount to nothing more than 'expectations,' not 'entitlements'" because there was never "a statute or rule, or even a practice, securing to attorneys a right to compensated [court] appointments." *Id.* at 1285. Similarly, the D.C. Circuit has explained in the land-use context, that whether zoning-related decisions implicate a protected property interest depends on "whether the [relevant] statute or regulation places substantial limits on the government's exercise of its licensing discretion." *George Washington Univ. v. District of Columbia*, 318 F.3d 203, 207 (D.C. Cir. 2003) (internal quotation marks omitted).

This case law demonstrates that whether a protected property interest exists turns on "the certainty of the plaintiff's expectation that [it] would receive the property." *Engquist*, 478 F.3d at 1004. In this case, the Developers' interest, which was wholly dependent on a particular exercise of the District's discretion, was too contingent to create an entitlement worthy of constitutional protection. The Developers had only a "unilateral expectation" that they would receive title, and unfortunately for them, "a mere unilateral expectation . . . is not a property interest entitled to protection." *Webb's Fabulous Pharmacies*, 449 U.S. at 161.

Finally, to the extent the Developers seek to establish a property interest on the basis of their "investment-backed expectation," they confuse the question whether a plaintiff has a cognizable *property interest* with the question whether the government has *taken* that property interest. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984) (distinguishing two questions: "(1) Does [the plaintiff] have a property interest protected by the Fifth Amendment's Taking Clause . . .?" and "(2) If so, does [the government's] use of the [alleged property] effect a taking of that property interest?"); *see also Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) (similar). In the context of regulatory takings, courts consider several factors, including whether a government action "interfere[d] with reasonable investment-backed expectations," to determine whether there has been a compensable *taking* of an already established property interest. *Ruckelshaus*, 467 U.S. at 1005 (internal quotation marks omitted). In other words, the existence of a "reasonable investment-backed expectation" does not create a property interest; it merely weighs in the analysis of whether the government has taken an established property interest. The Court declines to convert the Developers' investment-backed hope of realizing some future profit into a constitutionally protected property interest.

2.      *The Due Process Claim*

The Developers' due process claim fares no better. The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To establish a cognizable injury in fact, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). To be "particularized," the injury must be "personal, individual, distinct, and differentiated—not generalized or undifferentiated." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007).

To establish redressability, a plaintiff must show that it is "likely, as opposed to merely speculative, that [the] injury will be redressed by a favorable decision." *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) (alteration adopted and internal quotation marks omitted). When applying this standard, "[c]ourts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials." *Id.* at 24. "When redress depends on the cooperation of a third party, 'it becomes the burden of the appellant to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *Id.* at 24–25 (alteration adopted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

The Developers argue that the District violated the Due Process Clause by issuing a "deficient" notice that misrepresented the District's authority to foreclose, Second Am. Compl. ¶ 87, and by "rigg[ing]" the foreclosure sale to "favor the District and to deny innocent holders of legitimate interests in the [d]evelopment [l]and their just due," *id.* ¶ 88. Because of these actions, the Developers allegedly "lost (1) their right to earn rental income and other returns from the [l]and; (2) their substantial investments and development plans for the [l]and; (3) their property interest in obtaining title to the [l]and; and (4) the opportunity to participate in the foreclosure auction and receive their share of any surplus from the auction." Pl.'s Opp'n at 13, Dkt. 96. To remedy this harm, they contend that the foreclosure should be "set aside" and the Developers' "preexisting rights . . . reinstated." Second Am. Compl. ¶ 93. These injuries fail to establish standing.

Even assuming the first three asserted injuries are cognizable injuries in fact, the Court cannot remedy them by setting aside the foreclosure and reinstating the Developers' "preexisting rights." *Id.* ¶ 93. To be sure, the Developers expected to receive title to the land, and they

invested significant time and money based on that expectation. But "disappointment at having invested—and perhaps lost—time and money in [a] proposed project, without more, is not enough to establish standing." *Miami Bldg. & Const. Trades Council, AFL/CIO v. Sec'y of Def.*, 493 F.3d 201, 206 (D.C. Cir. 2007) (internal quotation marks omitted). The contracts alleged in the Second Amended Complaint required the District to consent to any transfer of title, and the District never provided that consent—despite multiple requests and reminders to do so. It follows that, even if the Court were to "set aside" the foreclosure, the District would still have the right not to permit the transfer of any property interest and thus to thwart UMC's ability to obtain title and realize any profit.

According to the Developers, the District assured them that it would transfer title to the land, and "[i]t is surely reasonable to assume that the government will keep its word." Pl.'s Opp'n at 22. But the Developers concede that the District "had yet to approve the transfer at the time of the foreclosure." *Id.* at 21. And although they, at times, suggest that the District had a "legal obligation[]" to permit the transfer, *id.* at 22, they do not sufficiently explain "how, or under what theory, [they] would be entitled" to compel the District to exercise its discretion in that way. *U.S. Ecology*, 231 F.3d at 25 (internal quotation marks omitted). At most, the Developers cite general duties of good faith and fair dealing and an exhibit to the GSI partnership agreement providing, "Upon request and subject to the approval rights of the [g]eneral [p]artner and [l]imited [p]artner, the [p]artnership will release from the lien any portion of the [p]roperty required to make . . . [a]dditional [d]evelopment financeable, such approval not to be unreasonably withheld." D.C.'s Mot. Ex. 1 ¶ 8.1, at 22; *see also* Pl.'s Opp'n at 37. This provision, however, does not plausibly strip the District of its substantial discretion under ¶ 4.2 of the agreement to refuse to provide its "prior written approval" for the transfer of any property.

D.C.'s Mot. Ex. 1 ¶ 4.2, at 5. And the Developers' failure to allege a plausible, legally

enforceable right to obtain the District's consent is particularly problematic in light of the D.C.

Circuit's admonishment that courts should be reluctant to "find standing when redress depends

largely on policy decisions yet to be made by government officials." *U.S. Ecology*, 231 F.3d at

24; *see also Miami Bldg.*, 493 F.3d at 205. Without more, the Court cannot conclude that it is

"likely, as opposed to merely speculative, that [the Developers'] injur[ies] will be redressed by a

favorable decision." *U.S. Ecology*, 231 F.3d at 24 (alteration adopted and internal quotation

marks omitted).

Apart from their alleged loss of rental income, investments, and an interest in obtaining

title, the Developers also allege that they were deprived of "the opportunity to participate in the

foreclosure auction and receive their share of any surplus from the auction." Pl.'s Opp'n at 13.

This theory, too, fails. As a threshold matter, the Developers were not entitled to any surplus

from the auction because they did not own the property. And as for the "opportunity to

participate in the foreclosure auction," the Developers have failed to allege more than "a

generally available grievance about government." *Hollingsworth v. Perry*, 570 U.S. 693, 706

(2013) (internal quotation marks omitted). It is well established that "[a] litigant raising only a

generally available grievance about government—claiming only harm to his and every citizen's

interest in proper application of the Constitution and laws, and seeking relief that no more

directly and tangibly benefits him than it does the public at large—does not state an Article III

case or controversy." *Id.* (internal quotation marks omitted). Divorced from the Developers'

alleged loss of investments and the other harms discussed above, the alleged loss of the

opportunity to participate in the foreclosure is simply "an asserted right to have the Government

act in accordance with law," which is "not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright*, 468 U.S. 737, 754 (1984).

To be sure, the loss of the opportunity to compete or to pursue a benefit can be a cognizable injury in fact. *See CC Distributors, Inc. v. United States*, 883 F.2d 146, 149–51 (D.C. Cir. 1989). But to prevail under that theory of standing, the plaintiff must show that it was "able and ready" to participate in the challenged event, here the foreclosure auction. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also Settles*, 429 F.3d at 1102 (parolee established injury in fact from denial of opportunity to have a representative at his parole hearing because he submitted a "declaration that had he been allowed to take a representative to his parole hearing, he would have made arrangements to obtain one and he believed that he would have been successful." (alterations and internal quotation marks omitted)). The Developers have not satisfied that standard here. There is no indication in the record that the Developers ever expressed an interest in participating in the foreclosure, and they chose not to intervene in a lawsuit challenging the foreclosure sale in advance. *Cf. U.S. AirWaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000) (plaintiff established that it was "ready, willing, and able" to bid in a government auction, in part because it "submitted bids in the original . . . auction but dropped out before securing any licenses" (internal quotation marks omitted)). On this record, the Court cannot conclude that the Developers' interest was sufficiently particularized to set it apart from all other citizens who share a generalized interest in their government following legally mandated procedures.[1]

---

[1] The Developers also appear to be precluded from relitigating this standing theory. The same theory was raised and contested by the same parties before the D.C. Court of Appeals; that court rejected their argument for the same reason—they had alleged only a "generalized grievance" that was insufficient to support standing, *UMC Dev.*, 120 A.3d at 46 n.27—and applying issue

In any event, to bring a claim under either the procedural or substantive components of the Due Process Clause, a plaintiff must establish a protected property interest. *See Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (procedural due process claim); *George Washington Univ.*, 318 F.3d at 206 (substantive due process claim); *see also Hettinga v. United States*, 677 F.3d 471, 479–80 (D.C. Cir. 2012) (affirming the dismissal of a due process claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) where the plaintiffs failed to establish a cognizable liberty or property interest). And "[a] property interest is the same under the Fifth Amendment due process clause as under the Fifth Amendment takings clause." *Foggy Bottom Ass'n*, 441 F. Supp. 2d at 89 n.3; *see also Roth*, 449 F.3d at 1286. It follows that the same failure to allege a protected property interest under the Takings Clause also dooms the developers' due process claim. The Court will therefore dismiss the Developers' two federal claims.

## B.     The D.C. Claims

The Court will also dismiss the Developers' D.C. claims. First, the doctrine of issue preclusion bars consideration of those claims. Second, even if issue preclusion does not apply, the Court would decline to take supplemental jurisdiction over the claims.

### 1.     *Issue Preclusion*

The doctrine of issue preclusion bars relitigation when "(1) the same issue was contested by the parties and submitted for judicial determination in a prior case, (2) the issue was actually

---

preclusion would not work a basic unfairness to the Developers, who were fully incentivized to litigate the theory before the D.C. Court of Appeals, *see Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 301, 306 (D.C. Cir. 2015). As will be discussed, the doctrine of issue preclusion applies to standing decisions of the D.C. Court of Appeals. *See Scahill v. District of Columbia*, 909 F.3d 1177, 1181–82 (D.C. Cir. 2018).

and necessarily determined by a court of competent jurisdiction in that prior case, and (3) preclusion does not result in basic unfairness to the party bound by the first determination." *Scahill*, 909 F.3d at 1181 (alteration and internal quotation marks omitted). The D.C. Circuit has explained that the doctrine serves the important goals of "protect[ing] against the expense and vexation attending multiple lawsuits, conserv[ing] judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Nat'l Ass'n of Home Builders v. EPA*, 786 F.3d 34, 41 (D.C. Cir. 2015) (alteration and internal quotation marks omitted).

There can be little doubt that the doctrine applies here. The parties contested the Developers' standing to bring the same seven D.C. claims before the D.C. courts, and the issue was submitted for judicial determination. *See generally UMC Dev.*, 120 A.3d. 37. The D.C. Court of Appeals actually and necessarily decided that the Developers lacked standing, and to decide that question, it "look[ed] to federal standing jurisprudence." *Id.* at 42; *see also id.* at 47–48; *Scahill*, 909 F.3d at 1181 (applying the doctrine of issue preclusion to a standing decision by the D.C. Court of Appeals on a D.C. claim). Finally, applying the preclusion doctrine here does not result in basic unfairness to the Developers because they were "on notice" that they had to establish standing before the D.C. Court of Appeals, and they "had the same incentives to litigate this standing issue before the D.C. Court of Appeals where [they] w[ere] challenging the same" foreclosure at issue here. *Scahill*, 909 F.3d at 1182.

The Developers do not dispute that they seek to pursue the very same claims that the D.C. courts considered in the previous proceeding. Instead, they argue that they should nevertheless be allowed to proceed with their claims for three reasons. None are persuasive.

*First*, the Developers invoke the curable defect doctrine, arguing that new factual allegations in their Second Amended Complaint cure the defect identified by the D.C. courts. Pl.'s Opp'n at 23–24.  It is true that the "curable defect exception allows relitigation of jurisdictional dismissals when a precondition requisite to the court's proceeding with the original suit was not alleged or proven, and is supplied in the second suit." *Nat'l Ass'n of Home Builders*, 786 F.3d at 41 (internal quotation marks omitted).  But the doctrine applies "only if a material change following dismissal cured the original jurisdictional deficiency." *Id.*  A prior court's decision "cannot be used as a mere instruction manual on how [a plaintiff] might correct defects in its claim of standing by doing a better job of pleading preexisting facts and arguing the law more forcefully in a new case." *Id.* at 43.  The Developers here have not alleged a single fact that postdates the D.C. proceedings.  As a result, they cannot benefit from the curable defect doctrine.[2]

*Second*, the Developers argue that issue preclusion does not apply because their D.C. complaint was dismissed "without prejudice" and "there has been no valid, final judgment on the merits."  Pl.'s Opp'n at 24 (internal quotation marks omitted).  But only claim preclusion, not issue preclusion, requires a "final, valid judgment on the merits." *Nat. Res. Def. Council v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008).  As the D.C. Circuit has explained, a "jurisdictional dismissal does not involve an adjudication on the merits," but it still "adjudicate[s] the court's

---

[2] The Court rejects the Developers' suggestion that, because it granted the Developers leave to amend their complaint in a minute order, issue preclusion cannot apply under the law of the case doctrine.  Pl.'s Opp'n at 23–24.  The Court ruled only that the Developers had made a sufficient showing under Federal Rule of Civil Procedure 15(a)(2) to warrant leave to amend because the motion to amend raised complex issues and the interests of justice were best served by resolving the issues raised with the benefit of full briefing. *See* Feb. 1, 2018 Minute Order; *see also Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) ("[I]t is an abuse of discretion to deny leave to amend unless there is sufficient reason.").

jurisdiction, and a second complaint cannot command a second consideration of the same jurisdictional claims." *Nat'l Ass'n of Home Builders*, 786 F.3d at 41 (internal quotation marks omitted); *see also id.* ("Issue preclusion applies to threshold jurisdictional issues like standing.").

Finally, the Developers argue that they did not have "a full and fair opportunity for litigation of the relevant issues" because the "threshold dismissal by the D.C. courts was unaccompanied by any hearing, any opportunity for leave to amend, and any development of a factual record." Pl.'s Opp'n at 25 (internal quotation marks omitted). There are only three equitable exceptions to issue preclusion. Those exceptions apply when there has been "an intervening change in controlling legal principles," when a "party to be bound lacked an incentive to litigate in the first trial, especially in comparison to the stakes of the second trial," and when "the prior proceedings were seriously defective." *Canonsburg Gen. Hosp.*, 807 F.3d at 306 (internal quotation marks omitted); *see also id.* ("There is no general public policy exception to the operation of *res judicata*." (internal quotation marks omitted)). Only the third exception for a "seriously defective" proceeding has any relevance to the Developers' argument, and that exception requires a far more substantial showing than the Developers have made here. Indeed, they have failed to show how the proceedings in the D.C. courts were defective, let alone seriously defective. A hearing was unnecessary then (as now) because there were no facts in dispute. And the Developers' own litigation strategy is largely to blame for their other concerns. As the D.C. Court of Appeals explained, "[I]n the four months that the District's motion to dismiss was pending in Superior Court . . ., the developers never asked to submit further briefing on the issue of standing or for an evidentiary hearing." *UMC Dev.*, 120 A.3d at 44 n.23. They also failed to "seek reconsideration . . . and ask for a hearing in conjunction with that motion."

*Id.* The Developers may not subject the defendants and the courts to endless rounds of litigation simply because they are dissatisfied with the first decision they received.

### 2. *Supplemental Jurisdiction*

Under 28 U.S.C. § 1367(a), district courts have "supplemental jurisdiction over all . . . claims that are so related to claims in the action within [their] original jurisdiction that they form part of the same case or controversy under Article III." District courts may, however, "decline to exercise supplemental jurisdiction over a claim" if "the claim raises a novel or complex issue of State law," it "substantially predominates over the claim or claims over which the district court has original jurisdiction," or "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." *Id.* § 1367(c). Supplemental jurisdiction "is a doctrine of discretion, not a plaintiff's right." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Courts must "consider and weigh in each case . . . the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise [supplemental] jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Typically, if "all federal-law claims are dismissed before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Shekoyan*, 409 F.3d at 424.

Even if the doctrine of issue preclusion did not bar consideration of the Developers' D.C. claims, the Court would decline to exercise supplemental jurisdiction. First, as the previously assigned judge explained when she granted the Developers' original motion to remand, the D.C. claims predominate over the federal claims. The Developers' "D.C. claims are four times as numerous as their federal claims, and provide a far broader basis for relief." *UMC Dev.*, 982 F. Supp. 2d at 20. They "present contract, property, tort, fiduciary duty, and equitable theories, whereas the two federal claims invoke relatively narrow grounds for relief under the Fifth

Amendment." *Id.*  Second, the state law questions are novel and complex.  They involve a web of contracts between private and public entities, the rights of NFPHC, "a special governmental instrumentality with its own authorizing legislation under the D.C. Code," *id.*, and difficult questions of sovereign immunity and entitlement to equitable relief, *id.* at 20–21.  Third, the state law questions "implicate distinctly local policy interests, and may affect the District's ability to enter into similar public-private ventures in the future." *Id.* at 21.  Finally, as noted, the Court will dismiss both of the Developers' federal claims, and this is not the unusual case in which the D.C. claims should nevertheless be allowed to proceed—especially when the Developers originally sought remand, Pl.'s Opp'n at 10, 44, and have had a full opportunity to litigate their D.C. claims in the D.C. courts, *see Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) ("[W]e have repeatedly held that a district court abuses its discretion when it maintains jurisdiction over a removed case presenting unsettled issues of state law after the federal claims have been dismissed.").

The Developers respond that "the D.C. state courts have made clear that they are disinclined to adjudicate the Developers' D.C.-law claims on the merits," and "only this Court can ever reach and adjudicate the weighty merits questions posed in this case."  Pl.'s Opp'n at 44–45.  But like the doctrine of issue preclusion, the doctrine of supplemental jurisdiction does not allow dissatisfied litigants to circumvent the rulings of other courts.  Here, principles of comity favor dismissal of the D.C. claims because the D.C. courts have already ruled on them. The Court therefore declines to take supplemental jurisdiction over the claims.[3]

---

[3] No party has argued that the D.C. claims should be remanded instead of dismissed, and the Court concludes that dismissal is appropriate here.  *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995) ("Whether to remand or dismiss is a matter normally left to the discretion of the district court."); *see also Deppner v. Spectrum*

**CONCLUSION**

For the foregoing reasons, the Court grants the District's and NFPHC's Motions to

Dismiss.  An Order consistent with this decision accompanies this Memorandum Opinion.


DABNEY L. FRIEDRICH
United States District Judge

August 13, 2019

---

*Health Care Res.*, 325 F. Supp. 3d 176, 191 (D.D.C. 2018) (dismissing state-law claims after considering the § 1367(c) factors and observing that § 1367(d) minimizes the risk of prejudice to the plaintiff by "provid[ing] for a thirty-day grace period for refiling in state court after dismissal," and "stop[ping] the clock on any otherwise-applicable limitations period during the pendency of the federal-court suit").